Filed 4/23/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| REYNALDO A. MALDONADO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S183961 |
| v. | ) | |
| | ) | Ct.App. 1/5 A126236 |
| THE SUPERIOR COURT OF SAN MATEO COUNTY, | ) | |
| | ) | |
| | ) | San Mateo County |
| Respondent; | ) | Super. Ct. No. SC065313 |
| | ) | |
| THE PEOPLE, | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |

A criminal defendant who tenders his or her mental state as a guilt or penalty issue waives the Fifth Amendment privilege against self-incrimination, and the Sixth Amendment right to counsel, " 'to the extent necessary to permit a proper examination of that condition.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 412 (*Carpenter*); see *Buchanan v. Kentucky* (1987) 483 U.S. 402, 422-423 (*Buchanan*).) In order to afford the prosecution a fair opportunity to rebut mental-state evidence proffered by the defense, a recent amendment to California's criminal-case reciprocal discovery statute (Pen. Code, § 1054.3)[1] specifically provides that when the defendant "places in issue his or her mental state at any phase of the criminal action," the prosecution may seek and obtain a court order

---

[1] All further unlabeled statutory references are to the Penal Code.

1

"that the defendant . . . submit to examination by a prosecution-retained mental health expert." (*Id.*, subd. (b)(1) (§ 1054.3(b)(1).) Here we must decide what general limits, if any, may properly be imposed on prosecutorial access to court-ordered examinations and their results, both before and after the defendant actually introduces mental-state evidence in the criminal trial, in order to vindicate or protect the defendant's Fifth and Sixth Amendment rights.

Petitioner Reynaldo A. Maldonado faces charges of first degree murder with a special circumstance. (§§ 187, subd. (a), 190.2, subd. (a).) In compliance with his statutory pretrial discovery obligations, he notified the prosecution of his intent to introduce evidence, through designated expert witnesses, that he suffers from neurocognitive deficits as a result of childhood brain trauma or congenital brain dysfunction. In response, the prosecution obtained an order for his examination by a psychiatrist, a psychologist, and a neurologist chosen by the prosecution.

Invoking his federal constitutional rights to counsel (U.S. Const., 6th Amend.) and against self-incrimination (*id.*, 5th Amend.), petitioner sought various protective orders as conditions of his submission to court-ordered pretrial mental examinations. Urging that a Fifth Amendment waiver would occur only if and when he presented mental-state evidence at trial, petitioner sought to bar the prosecutors from observing the examinations directly, from discussing them with the examiners, and from otherwise learning anything about them, unless and until he actually introduced such evidence. Even then, he proposed, prosecutors should not have contact with the examiners, or learn anything about the examination results, until the court first inspected the examination materials in camera to determine what information the prosecution was entitled to receive as potential rebuttal evidence.

The trial court agreed that prosecutors should not be present in the examination room itself, but the court otherwise denied these requests. It reasoned that the prosecution is entitled to the examination results under the reciprocal discovery statute, and that petitioner's Fifth Amendment privilege is protected despite such disclosure because the prosecution cannot make direct or derivative *use* of the examinations or their results at his criminal trial, except as necessary to rebut any mental-state evidence he introduces in his own behalf.

Petitioner sought a writ of mandate, and the Court of Appeal granted partial relief. The majority acknowledged that the Fifth Amendment bars not mere *disclosure*, but actual *use*, direct or derivative, of a declarant's compelled utterances to convict or criminally punish that person. The majority also agreed with the People that the prosecution need not wait to receive and evaluate the examination results until petitioner actually presents mental-state evidence at trial. However, the majority expressed concern that if information about the examinations is prematurely disclosed, the prosecution may use it for purposes prohibited by the Constitution. The majority therefore concluded that the constitutional bar itself is not an adequate protection of petitioner's Fifth Amendment privilege against self-incrimination, and that further "prophylactic" measures are required.

Accordingly, the majority directed the trial court to modify its prior orders to provide that (1) prosecutors be precluded from monitoring the examinations as they occur in "real time," (2) pretrial access by the prosecution to the examiners and the examination materials be prohibited until, within times specified by the trial court, petitioner files, under seal if he desires, motions asserting privilege objections to full or partial disclosure of any statements he made during the examinations, whereupon (3) the court will inspect the examination materials in camera, resolve issues of privilege, redact the materials accordingly, and disclose

only the remainder to the prosecution, subject to any conditions necessary to preserve further valid assertions of privilege, and to preclude improper derivative use.

The Court of Appeal dissenter contended at length that use and derivative use immunity, enforced as necessary during the trial itself, are sufficient safeguards of petitioner's constitutional rights. In the dissenter's view, the elaborate prophylactic procedures adopted by the majority are unnecessary, impractical, and unfair to the prosecution, and would produce needless delay in the trial proceedings.

We agree, for the most part, with the conclusions reached by the Court of Appeal dissent. By forcing the trial court to resolve defense claims of privilege prior to trial, without prosecutorial access to the evidence in dispute, the Court of Appeal majority has imposed procedures that are neither required nor justified by the Fifth and Sixth Amendments, and are manifestly unfair to the prosecution. We will therefore reverse the Court of Appeal's judgment with directions to deny the petition for mandamus.

### FACTS AND PROCEDURAL BACKGROUND

In January 2008, the San Mateo County District Attorney charged petitioner with first degree murder and alleged a lying-in-wait special circumstance. (§§ 187, subd. (a), 190.2, subd. (a)(15).)[2] Petitioner retained three mental health professionals to evaluate him for purposes of a possible mental-state defense. Thereafter, in compliance with its obligations under the criminal-case reciprocal discovery statute (§ 1054.3, subd. (a)(1)), the defense furnished the prosecution with an outline of the mental-state evidence it intended to tender at

---

[2]     The prosecution is not seeking the death penalty.

4

trial. This included evidence that, as the result of a childhood fall, petitioner was rendered unconscious and now suffers chronic headaches. Also provided were the examination reports of Jeffrey Kline, Ph.D., a psychologist, Peter Cassini, M.D., a psychiatrist, and Robert Perez, Ph.D., a neuropsychologist, indicating that petitioner has a mildly retarded IQ and suffers moderate to severe neurocognitive defects suggestive of acquired brain injury or congenital brain dysfunction.[3]

In response, the prosecution moved, pursuant to Evidence Code section 730, for an order compelling petitioner to submit to mental examinations by court-appointed experts, including a psychologist, a psychiatrist, and a neurologist. On August 18, 2009, the trial court granted the motion.[4] On August 28, 2009, petitioner sought a writ of mandamus/prohibition to bar the examinations. On September 4, 2009, the Court of Appeal summarily denied the petition. Petitioner

---

[3] These facts, undisputed by the People, are derived solely from representations in the mandamus petition and its supporting exhibits. The sparse record does not include the defense experts' reports themselves.

[4] Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

The prosecution's motion, and the court's order, predated the adoption of Penal Code section 1054.3(b)(1), which now specifically provides that when a criminal defendant places his or her mental state in issue, the prosecution may obtain a court order "that the defendant . . . submit to examination by a prosecution-retained mental health expert." (See further discussion in fn. 5, *post.*)

5

sought review, and we stayed further proceedings pending our consideration of the petition for review. We denied review on September 23, 2009.[5]

Meanwhile, on August 18 and August 24, 2009, petitioner moved in the trial court for various protective measures related to the court-ordered examinations. These included requests that all prosecution or law enforcement representatives be prohibited from attending the examinations, and that the prosecution be denied all access to reports, notes, and recordings of the examinations, and barred from all contact with the examiners themselves, until the close of the defense case, and thereafter until the court (1) inspected the examination materials in camera to determine whether the prosecution should have

---

[5]    The August 28, 2009, petition was based on our decision in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096 (*Verdin*). There we held that, except for "other express statutory provisions" (§ 1054, subd. (e)), section 1054.3 sets forth the exclusive scope of required reciprocal discovery in criminal cases, and that, as then constituted, section 1054.3 made no provision for the defendant's compelled submission to evaluations by prosecution mental health experts. We declined, however, to consider the People's argument in *Verdin* that the court-ordered examination there sought was expressly authorized by Evidence Code section 730. We pointed out that the prosecution had not invoked this statute in seeking the examination. Moreover, we observed, the trial court in *Verdin* had not itself appointed an expert, as Evidence Code section 730 specifies, but had ordered the defendant to submit to examination by an expert retained by the prosecution.

In response to *Verdin*, the Legislature added subdivision (b)(1) to section 1054.3, effective January 1, 2010. (Stats. 2009, ch. 297, § 1.) As noted above (fn. 4, *ante*), this provision explicitly authorizes the prosecution to obtain a court order for the defendant's examination by a prosecution-retained mental health expert when the defendant places his or her mental state in issue. Though the instant trial court's original August 2009 examination order was made under authority of Evidence Code section 730, petitioner does not dispute before us that the prosecution's selection of experts was proper under the later-enacted provisions of section 1054.3(b)(1).

6

access to them, and (2) decided issues of admissibility at a hearing at which both parties would have the right to be heard.[6]

Petitioner premised these requests primarily on his Fifth Amendment privilege against self-incrimination. He urged that he would waive this privilege only if, when, and to the extent he actually presented mental-state evidence in his own behalf at the trial. Until then, he insisted, the prosecution was not entitled to learn of the fruits of the compelled examinations, or of any statements he made to the examiners.

The People agreed that only petitioner and the experts should be directly present in the examination room. They also acknowledged that, if petitioner ultimately chose not to introduce mental-state evidence at trial, evidence from the

---

[6] These proposals were items Nos. 5, 6, 7, 8, and 10 of petitioner's August 18, 2009, request. As pertinent here, they provided that the court should "[¶] 5) . . . prohibit any district attorney, attorney general, U.S. Attorney, or special prosecutor, or any of their law enforcement agents, including but not limited to Daly City Police, [and the] San Mateo County Sheriff's Office from being present during the conduct of any of the examinations . . . ; [¶] 6) . . . prohibit access by any officials referred to under item 5 to any of the reports, notes, and/or recordings of the examinations and investigations by any of the [court-appointed] experts . . . until after the close of the defense case at the jury trial . . . , upon which the Court will inspect, *in camera*, any such reports, notes, and/or recordings . . . to determine whether the prosecution should have copies of such reports, notes, and/or recordings; [¶] 7) . . . decide the question of admissibility of any of the evidence adduced as a result of the work of the [court-appointed] experts . . . only after the steps in item 6 have been completed and only upon a hearing at which both parties have the right to be heard; [¶] 8) . . . prohibit any officials referred to under item 5 from any contact with any [court-appointed] experts . . . until after the Court's *in camera* decision referred to in item 6 and only if the Court grants the prosecution permission to do so; [¶] 9) . . . ; [¶] 10) . . . require the [court-appointed] experts . . . to maintain confidentiality regarding their examinations and investigations of [petitioner], with the . . . exception that said experts will provide the Court with copies of their notes, reports, and recordings, immediately following the conclusion of their work."

7

court-ordered examinations would not be admissible. Nonetheless, the People urged they were entitled to monitor the examinations in "real time," and to know the examination results in advance of trial, in order to anticipate and develop their response in the event petitioner pursued his mental-state defense. In open court, the prosecutor also made the representation — unchallenged by defense counsel — that in this particular case, the prosecution already had petitioner's several police statements, the results of petitioner's examinations by the defense experts, and the statements petitioner had made to these experts.[7] Accordingly, the prosecutor argued, the People would gain no unfair tactical advantage by advance access to the results of the court-ordered examinations.

The trial court agreed there was no need for prosecution representatives to be in the examination room itself, since it appeared possible to monitor the examination in "real time" from a remote location. The court deferred a ruling on when issues of trial admissibility should be decided. But it otherwise declined to bar the prosecution from observing the examinations as they occurred, or from obtaining prompt access to the examiners and their examination notes and reports. The court agreed with the prosecution that "[i]f you're going to get the reports anyway, which you're entitled to under reciprocal discovery, then it doesn't make much sense to preclude you from attending the actual interview." The court also noted the prosecutor's representation that, under the specific facts of this case, the prosecution would not profit unfairly by obtaining advance access to the examinations and their results, including any statements made by petitioner to the examiners about the charged crimes.

---

[7]     None of these items is included in the record on mandamus.

Petitioner sought mandate. The Court of Appeal, First Appellate District, Division Five, issued an alternative writ directing the trial court to vacate its order denying items Nos. 5, 6, 7, 8, and 10 and to enter a new order granting those items, or to show cause why a peremptory writ to that effect should not issue. When the trial court declined to modify its order, the Court of Appeal stayed the trial proceedings and scheduled the matter for argument. Thereafter, the Court of Appeal ordered issuance of a peremptory writ of mandate directing the trial court to implement certain protective measures.

The Court of Appeal majority agreed with the People that the Fifth Amendment does not forbid disclosure, as such, of incriminating words a person was officially compelled to utter, but simply prohibits use of the compelled utterances against the declarant in a criminal case, either as direct evidence or as an aid to discovery of other incriminating evidence (derivative use). The majority also recognized that the reciprocal discovery statutes call for accelerated (i.e., pretrial) disclosure of anticipated witnesses and evidence, and observed that such accelerated discovery does not, in and of itself, offend the Constitution. Accordingly, the majority rejected petitioner's argument that disclosure to the prosecution of his examination results, including his statements to the examiners, must await the actual waiver of his Fifth Amendment privilege by his presentation of mental-state evidence at trial. The majority was persuaded that such belated disclosure would be unfair to the prosecution in its efforts to prepare a rebuttal case, and would lead to unnecessary midtrial delay.

Nonetheless, the Court of Appeal majority concluded, certain prophylactic measures are necessary to ensure that the prosecution does not make improper use of any statements by petitioner to the prosecution examiners that would potentially fall outside the scope of a limited Fifth Amendment waiver occasioned by his presentation of a mental-state defense. The majority ruled that, while nothing

9

should preclude the prosecution from immediately learning their experts' ultimate opinions and diagnoses, any prosecutorial access to petitioner's statements to the prosecution examiners, or to materials containing such statements, should be subject to a "minor *pretrial* delay" (italics added) during which the court, after inspecting the statements in camera, should rule on privilege objections asserted by the defense in timely fashion, should redact the examination materials accordingly, and only then should release them to the prosecution.

Accordingly, the Court of Appeal's judgment specified that, insofar as the trial court's original order denied petitioner's requested items Nos. 5, 6, 7, 8, and 10, that order should be replaced with new provisions (1) barring the prosecuting attorneys and their agents from observing the examinations in real time; (2) precluding all persons present at the examinations, including the examiners, from disclosing any statements made by petitioner therein until expressly authorized by the court to do so; (3) allowing petitioner, "[w]ithin a specified amount of time after the conclusion of each examination (to be determined by the trial court)," to assert, by a sealed motion if he so desires, privilege objections to disclosure of statements he made during the examination; and (4) providing that the court, after inspecting the materials in camera, "shall determine if [petitioner's] statements to the examiners, in whole or in part, remain subject to Fifth Amendment privilege [and shall] redact any statements it finds to be privileged," following which the court may release the balance of the examination materials to the prosecution, subject to any conditions or limitations necessary to preserve a valid assertion of privilege or prevent improper derivative use.

The dissenting justice first urged that extraordinary writ relief is premature and inappropriate. Petitioner has not yet uttered any incriminating statement, the dissent observed, and he could seek a protective order against direct or derivative use of any such statement once the prosecutor actually learned of it. In any event,

10

the dissent asserted, if petitioner is convicted in a trial where the court has erred prejudicially by allowing the prosecution's direct or derivative evidentiary use of statements protected by the privilege, he will have an adequate remedy by appeal.

On the merits, the dissent contended vigorously that the majority's prophylactic procedures are unnecessary to protect petitioner's Fifth Amendment rights. The dissent reasoned that these rights are adequately safeguarded by the immunity against *use*, either direct or derivative, of petitioner's statements against him, except as necessary to rebut any mental-state defense he actually presents at trial. Moreover, the dissent asserted, despite the majority's contrary assurances, the procedures it has dictated will produce significant trial delay and create "daunting" problems for a trial court forced to rule on petitioner's privilege objections without knowing what mental-state evidence he will ultimately present.

Both petitioner and the People sought review. Petitioner urged that the Court of Appeal had erred by allowing the prosecution even limited access to the court-ordered examinations before he actually waives his Fifth Amendment privilege by presenting mental-state evidence at trial. The People argued that the Court of Appeal's prophylactic restrictions on such pretrial access are unwarranted, and that pretrial mandamus relief is inappropriate in any event.

We granted the People's petition and denied petitioner's. We now conclude that the Court of Appeal's judgment must be reversed with directions to deny the petition for mandamus.

11

# DISCUSSION[8]

## 1. Propriety of extraordinary relief.

The People first urge that pretrial writ proceedings to review the trial court's examination order are not justified. The People argue, as did the Court of Appeal dissent, that interim review of discovery orders is generally disfavored, that such review is unnecessary to protect petitioner's Fifth Amendment privilege against improper use of his examination statements at his criminal trial, and that if the trial court were to allow such improper use, petitioner would have an adequate remedy by appeal. Citing the majority opinion in the Court of Appeal, petitioner responds that courts frequently employ extraordinary writ proceedings to review discovery requests to ensure that the discovery itself does not infringe Fifth Amendment rights.

We need not debate these points. Mandamus is appropriate to address discovery issues that present novel issues of first impression and general importance. (E.g., *Williamson v. Superior Court* (1978) 21 Cal.3d 829, 833; *Daly v. Superior Court* (1977) 19 Cal.3d 132, 140; *Oceanside Union School Dist. v. Superior Court* (1962) 58 Cal.2d 180, 185-186, fn. 4.) Recently, in *Verdin*, *supra*, 43 Cal.4th 1096, we assumed without discussion that pretrial mandamus review was a proper means to address whether a court order for the mental examination of a criminal defendant by prosecution-retained experts, similar to the order at issue here, was authorized by the limited and exclusive reciprocal criminal discovery provisions of section 1054.3, as then in force. We

---

**8** Amicus curiae briefs have been submitted on petitioner's behalf (1) by California Attorneys for Criminal Justice and (2) jointly by the California Public Defenders Association and the Public Defender of Ventura County (Ventura County Public Defender).

answered "no" to that question, thereby making it unnecessary to address the federal and state constitutional issues the petitioner in that case had also raised.

In response to *Verdin*, the Legislature amended section 1054.3 to provide express authority for such court-ordered examinations where the defendant "places in issue his or her mental state at any phase of [a] criminal action." (*Id.*, subd. (b)(1), (2).) The instant examination order preceded the effective date of these amendments. However, the parties do not dispute that current section 1054.3 provides sufficient statutory support for an order requiring petitioner, having signaled his intent to present mental-state evidence in his defense, to submit to a mental examination by prosecution-retained experts.

This case thus presents an early opportunity to determine whether, and if so, what, protective measures in the conduct of the examination, and in the disclosure of its results, are necessary to protect a defendant's rights under the Fifth and Sixth Amendments to the United States Constitution. The importance of resolving such issues sooner rather than later is manifest. We have no doubt that the Court of Appeal made proper use of this writ proceeding to address them. We proceed to the merits of the parties' substantive arguments.

### 2. Fifth Amendment.

At the outset, the Court of Appeal and the parties appear to agree on the following points: By presenting, at trial, a mental-state defense to criminal charges or penalties, a defendant waives his or her Fifth Amendment privilege to the limited extent necessary to allow the prosecution a fair opportunity to rebut the defense evidence. Under such circumstances, the Constitution allows the prosecution to receive unredacted reports of the defendant's examinations by defense mental experts, including any statements by the defendant to the examiners and any conclusions they have drawn therefrom. The prosecution is also constitutionally permitted to obtain its own examination of the accused, and

13

to use the results, including the accused's statements to the prosecution examiners, as is required to negate the asserted defense.  If the defendant refuses to cooperate with the prosecution examiners, the court may impose sanctions, such as advising the jury that it may consider such noncooperation when weighing the opinions of the defense experts.  On the other hand, except for appropriate rebuttal, the defendant's statements to the prosecution experts may not be used, either directly or as a lead to other evidence, to bolster the prosecution's case against the defendant.  (E.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1264; *Carpenter*, *supra*, 15 Cal.4th 312, 412-413; *People v. McPeters* (1992) 2 Cal.4th 1148, 1190; *People v. Coleman* (1989) 48 Cal.3d 112, 151-152; *People v. Williams* (1988) 44 Cal.3d 883, 961 [insanity plea]; see *Buchanan*, *supra*, 483 U.S. 402, 422-423 [where defendant places mental state in issue, or otherwise requests mental examination, prosecution may rebut defense mental case with examination results]; *Kastigar v. United States* (1972) 406 U.S. 441, 453 (*Kastigar*) [state may compel potentially incriminating testimony despite witness's invocation of Fifth Amend. privilege, but only upon providing direct and derivative use immunity that affords witness same protections against criminal prosecution as if he or she had remained silent].)**9**

---

**9**     This bar extends at least to the prosecution's case-in-chief.  In *People v. Pokovich* (2006) 39 Cal.4th 1240, the majority concluded that when the defendant testifies in his or her own behalf at his criminal trial, the Fifth Amendment bars *impeachment* of such testimony with statements the defendant earlier made to mental health examiners appointed by the court to determine his or her competence to stand trial.  (But see *Pokovich*, *supra*, at p. 1255 et seq. (conc. & dis. opn. of Baxter, J.).)  The majority reasoned that this rule is necessary to protect the defendant's constitutional privilege against self-incrimination while encouraging cooperation in a court-initiated competency proceeding in which the defendant is not compelled to respond.  (*Pokovich*, *supra*, at pp. 1244-1254; see *Estelle v. Smith* (1981) 451 U.S. 454, 468-469 (*Estelle*).)  Neither United States

*(Footnote continued on next page.)*

From then on, the parties' respective positions diverge sharply, and neither entirely agrees with the Court of Appeal's holding. Petitioner urges as follows: No limited waiver of Fifth Amendment rights will occur unless and until he actually presents mental-state evidence in his defense at trial. In the meantime, he may *assert*, and has asserted, his constitutional privilege to refuse to respond to the prosecution examiners in ways that may incriminate him. Accordingly, the Fifth Amendment directly excuses him from providing such responses under compulsion unless he receives advance assurances, akin to immunity guarantees, that the prosecution will use evidence derived from the examinations solely as proper rebuttal to any mental evidence he ultimately presents. This can only be accomplished, he insists, by shielding the prosecution from all access to the court-ordered examinations or their results until he actually presents mental evidence at trial (or, at a minimum, until "after the close of the prosecution case-in-chief[,] but only if the defense [then] confirms its intent to present mental health evidence").

On the other hand, the People insist that the Fifth Amendment does not, per se, prohibit official compulsion to communicate information that may be personally incriminating. Instead, they posit, the constitutional bar is simply against the actual *use* of compelled self-incriminating communications to support a criminal guilt or penalty case against a declarant who has not waived the privilege.

*(Footnote continued from previous page.)*

Supreme Court nor California decisions have confronted the question, not presented here, whether, if the accused chooses to testify at trial, his or her prior statements during a court-ordered examination initiated by the defense's voluntary decision to present mental-state evidence on the issue of guilt or penalty may be used to impeach that testimony.

The People thus urge that here, as in other cases where self-incriminating disclosures may be officially compelled despite invocation of the Fifth Amendment privilege, petitioner's rights are fully protected by the rule — understood to apply in this case — that he has full use immunity, both direct and derivative, for any statements he makes in the examinations, except to the extent he voluntarily waives the privilege by presenting a mental-state defense at trial. Accordingly, the People argue, there is neither a direct constitutional mandate, nor prophylactic justification, for further measures, such as bans or limitations on the prosecution's pretrial observation of, or access to, mental examinations by its own experts, as ordered under section 1054.3(b)(1).

The Court of Appeal majority took a third tack. It agreed that the prosecution is entitled to some accelerated (i.e., pretrial) access to the examination materials. However, it concluded that immunity against improper trial use, direct or derivative, of the materials is insufficient to safeguard petitioner's Fifth Amendment rights. Believing that further prophylactic measures are required, the Court of Appeal majority ruled that, although prosecution representatives must be barred from observing the examinations directly, recordings and reports of the examinations may be released to the prosecution before trial, but only after the trial court inspects them in camera, rules on petitioner's Fifth Amendment privilege objections, and redacts the materials accordingly.

We are not persuaded by the approaches of petitioner or the Court of Appeal majority. As both this court and the United States Supreme Court have made clear, the Fifth Amendment does not directly prohibit the government from *eliciting* self-incriminating disclosures despite the declarant's invocation of the Fifth Amendment privilege. Absent a valid waiver of Fifth Amendment rights, this constitutional provision simply bars the direct or derivative *use* of such

16

officially compelled disclosures to convict or criminally punish the person from whom they were obtained.

Nothing convinces us that, as a general proposition, further measures are necessary or justified to safeguard Fifth Amendment rights in the context of pretrial court-ordered mental examinations by prosecution experts, as triggered by a criminal accused's notice of intent to present a mental-state defense through his own experts. Indeed, as we explain below, the protective procedures devised by the Court of Appeal majority appear impractical and decidedly unfair to the prosecution.

At the outset, we find no merit to petitioner's primary argument — that because a waiver of his Fifth Amendment privilege will occur only if and when he actually presents mental-state evidence at trial, he has, in the meantime, a direct constitutional right to refuse to speak to court-ordered examiners unless he is assured that all access to his statements will be withheld from prosecutors until such a waiver occurs. This argument misconceives the Fifth Amendment as a guarantee against officially compelled *disclosure* of potentially self-incriminating information. Such is not the case.

The Fifth Amendment provides, in pertinent part, that no person "shall be compelled *in any criminal case to be a witness against himself.*" (U.S. Const., 5th Amend., italics added.) The meaning of this language was extensively discussed in *Chavez v. Martinez* (2003) 538 U.S. 760 (*Chavez*). In *Chavez*, a federal civil rights action (42 U.S.C. § 1983), the plaintiff alleged that defendant police officer had violated his Fifth Amendment right when, during a custodial interview while the plaintiff was receiving treatment for gunshot wounds sustained in a shootout with police, the officer extracted self-incriminating information without providing the warning and obtaining the waiver required by *Miranda v. Arizona* (1966) 384 U.S. 436. The plaintiff's responses to the officer were never

17

used against him in any criminal prosecution. The issue in *Chavez* was whether, in the civil suit, the officer could assert the defense of qualified immunity for discretionary official actions taken in good faith that "[do] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818.)

Finding that the qualified immunity was available, six members of the *Chavez* court agreed that a "core" Fifth Amendment violation is completed, not merely by official extraction of self-incriminatory answers from one who has not waived the privilege, but only if and when those answers are *used in a criminal proceeding* against the person who gave them. (*Chavez*, *supra*, 538 U.S. 760, 766-773 (plur. opn. of Thomas, J.); see *id.*, at p. 777 (conc. opn. of Souter, J., joined by Breyer, J.).) As Justice Thomas explained, "[s]tatements compelled by police interrogations of course may not be used against a defendant at trial, [citation], but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs, see *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) 'The privilege against self-incrimination guaranteed by the Fifth Amendment is *a fundamental trial right* of criminal defendants. Although conduct by law enforcement officials prior to trial may ultimately impair that right, *a constitutional violation occurs only at trial*' . . .; *Withrow v. Williams*, 507 U.S. 680, 692 (1993) (describing the Fifth Amendment as a ' " 'trial right' " '); *id.*, at p. 705 (O'Connor, J., concurring in part and dissenting in part) (describing 'true Fifth Amendment claims' as 'the extraction *and use* of compelled testimony' . . .)." (*Chavez*, *supra*, at p. 767 (plur. opn. of Thomas, J.), italics added & altered in *Chavez*.) Only when statements officially coerced from a person are "admitted as testimony against him in a criminal case," Justice Thomas observed, is that person "made to be a 'witness' against himself in violation of the Fifth Amendment's Self-Incrimination Clause." (*Ibid.*)

18

Justice Thomas further explained that "[i]n the Fifth Amendment context, we have created *prophylactic rules* designed to safeguard the core constitutional right protected by the Self-Incrimination Clause.  [Citations.]  Among these rules is an evidentiary privilege that protects witnesses" who invoke their Fifth Amendment rights "from being forced to give incriminating testimony, even in non-criminal cases, unless that testimony has been immunized from use and derivative use in a future criminal proceeding before it is compelled.  See *Kastigar*, *supra*, [406 U.S.] at 453; *Maness v. Meyers*, 419 U.S. 449, 461-462 (1975) (noting that the Fifth Amendment privilege may be asserted if one is 'compelled to produce evidence which later *may* be used against him as an accused in a criminal action' . . . .)." (*Chavez*, *supra*, 538 U.S. 760, 770-771 (plur. opn. of Thomas, J.), first italics added.)  The rule allowing a witness to assert the privilege prior to testifying, and to refuse to testify unless granted immunity, Justice Thomas indicated, protects the "core" Fifth Amendment privilege simply by assuring that the witness has not forfeited the right against self-incriminating use of his or her testimony in later criminal proceedings.  (*Chavez*, *supra*, at p. 771.)

We recently confirmed this view of the Fifth Amendment, holding that a public employee could be threatened with, and subjected to, job discipline for refusing, on Fifth Amendment grounds, to answer his superiors' questions about his job performance despite repeated assurances from the employer that what he said could not be used against him, directly or indirectly, in a criminal prosecution. (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704.)  Adopting the conclusion of *Chavez* that the Fifth Amendment does not prohibit official compulsion to speak, but merely precludes the use of compelled statements in a criminal case against the declarant, we held that in the context of a noncriminal investigation by a public employer, the employee could be compelled to answer

questions about his performance of duty, even without a formal immunity agreement, so long as he was not required to *surrender* the immunity *conferred by the Fifth Amendment itself* against use and derivative use of his statements to prosecute him for a criminal offense. (*Spielbauer*, *supra*, at pp. 714-730; see *Sanitation Men v. Sanitation Comm'r* (1968) 392 U.S. 280, 285; *Gardner v. Broderick* (1968) 392 U.S. 273, 277-279; *Uniformed S.M. Ass'n, Inc. v. Commissioner of S. of N.Y.* (2d Cir. 1970) 426 F.2d 619, 626-627; see also *Adams v. Maryland* (1954) 347 U.S. 179, 181.)

Here, as noted above, the parties agree that the Fifth Amendment protects petitioner against any direct or derivative use of his statements to the prosecution examiners, except to rebut any mental-state evidence he presents through his own experts.[10] That is all it does. Yet petitioner seeks more. As a condition of his submission to the examinations, he proposes to exclude the prosecution from

---

[10] To the extent petitioner and other criminal defendants are entitled, as a prophylactic protection of their Fifth Amendment privilege, to decline to submit to court-ordered mental examinations until they receive advance assurance of immunity against overbroad direct and derivative use of their responses to the examiners, we may, and we do, *judicially declare* such an immunity as " 'reasonably to be implied' " from the statutory provision allowing the prosecution to obtain such examinations for the limited purpose of rebutting anticipated mental-state defenses. (*People v. Arcega* (1982) 32 Cal.3d 504, 520 [confirming judicial immunity against use, in prosecution's case-in-chief, of accused's compelled statements to court-ordered competency examiners]; *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 469 [same]; see *Byers v. Justice Court* (1969) 71 Cal.2d 1039, 1049-1058 [as protection against potential for violation of privilege against self-incrimination, financial responsibility law requiring motorist involved in accident causing property damage to furnish his or her identity to owner of damaged property must be construed to provide immunity from direct or derivative use of such information in criminal prosecution against motorist], vacated on other grounds in *California v. Byers* (1971) 402 U.S. 424 [holding that above described "hit and run" statute does not implicate Fifth Amend. concerns]; but see fn. 9, *ante*.)

20

*observing* them, and then to bar prosecutors from all *access* to the examiners, or to the reports, notes, and recordings of the examinations, until he has actually presented such defense evidence at trial. Even then, he insists, the prosecution may only receive a version of the examination materials that the court has redacted after an in camera inspection.

Though the Court of Appeal majority did not go quite so far, it also devised protections beyond those the Constitution itself provides. While the Court of Appeal majority disagreed with petitioner that prosecutors should be denied all access to the examination materials unless and until petitioner presents mental-state evidence at the trial itself, the majority nonetheless concluded that prosecutors could not observe the examinations, and could obtain access to the examination materials only under a procedure whereby the court would consider petitioner's privilege objections pretrial, and would inspect and redact the examination materials in camera, before allowing the prosecution any access to them.

But because these protections exceed those afforded by the Constitution, they also exceed the scope of any prophylactic assurances, "coextensive with . . . the [constitutional] privilege," to which petitioner might be entitled before being compelled to speak over his invocation of his Fifth Amendment rights. (*Kastigar*, *supra*, 406 U.S. 441, 453.) "While a grant of immunity must afford protection commensurate with that afforded by the [constitutional] privilege, *it need not be broader*." (*Ibid.*, italics added.)[11] The same principle applies to the advance assurances and protections petitioner seeks here.

---

[11] Applying this principle, *Kastigar* held that one compelled to testify in a noncriminal proceeding despite invoking the Fifth Amendment privilege is entitled *only* to immunity against use of the compelled statements in a subsequent

*(Footnote continued on next page.)*

Furthermore, the United States Supreme Court has strongly indicated that Fifth Amendment rights are not compromised by a requirement that the accused provide the prosecution with accelerated pretrial discovery about a defense he or she anticipates presenting in the trial itself. In *Williams v. Florida* (1970) 399 U.S. 78, the high court upheld a state law that required a criminal accused who intended to present an alibi defense to disclose to the prosecution, prior to trial, where he claimed to have been at the time of the charged offense and the names and addresses of the alibi witnesses he intended to call; in return, the prosecution was required similarly to disclose to the defense the witnesses it proposed to call in rebuttal.

The defendant in *Williams v. Florida* had challenged the notice-of-alibi law on due process, fair trial, and self-incrimination grounds. The high court quickly rejected the due process and fair trial contentions. Stressing the reciprocal nature of the parties' discovery obligations, the court noted, among other things, that "the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate" (*Williams v. Florida*, *supra*, 399 U.S. 78, 81), and that "[t]he adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played" (*id.*, at p. 82).

As to the self-incrimination argument, the court observed that accelerated discovery of the defendant's alibi defense and witnesses does not improperly

---

*(Footnote continued from previous page.)*

prosecution, not to complete "transactional" immunity against prosecution itself. As *Kastigar* explained, use immunity suffices to place the witness in the same position as if he or she had provided no self-incriminating testimony. (*Kastigar*, *supra*, 406 U.S. 441, 457, 462.) The Constitution requires no more.

22

compel him to choose between his Fifth Amendment privilege and his right to present a defense. *At trial*, the court explained, the defendant would have to decide whether to present the defense through his own witnesses and, perhaps, his own testimony, or to remain silent and abandon the defense. Such a trial choice, the court noted, has never been thought to violate the Fifth Amendment. "However 'testimonial' or 'incriminating' the alibi defense proves to be," the court indicated, "it cannot be considered 'compelled' within the meaning of the Fifth . . . Amendment[ ]." (*Williams v. Florida*, *supra*, 399 U.S. 78, 84.)

A pretrial notice-of-alibi requirement, the court stated, presents no fundamentally different decision. "Nothing in such a rule requires the defendant to rely on an alibi or prevents him from abandoning the defense; these matters are left to his unfettered choice. That choice must be made, but the pressures that bear on his pretrial decision are of the same nature as those that would induce him to call alibi witnesses at the trial . . . ." (*Williams v. Florida*, *supra*, 399 U.S. 78, 84-85, fn. omitted.)

"At most," the high court stressed, "the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that [he] from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself." (*Williams v. Florida*, *supra*, 399 U.S. 78, 85.)

If there were no notice-of-alibi rule, the court made clear, the prosecution would be entitled to a midtrial continuance, on grounds of surprise, the moment the defendant offered an alibi witness. The Fifth Amendment then would not prohibit the prosecution from doing exactly what the rule allowed it to do pretrial

23

— take the witness's deposition and prepare a rebuttal. (*Williams v. Florida*, *supra*, 399 U.S. 78, 85-86.) "[I]f so utilizing a continuance is permissible under the Fifth . . . Amendment[ ], then surely the same result may be accomplished through pretrial discovery, as it was here . . . ." (*Id.*, at p. 86.)[12]

In *Woods v. Superior Court* (1994) 25 Cal.App.4th 178, the Court of Appeal applied the *Williams v. Florida* analysis to conclude that the defense obligation to provide pretrial discovery of the results of "mental examinations . . . which the *defendant* intends to offer in evidence at the trial" (§ 1054.3, subd. (a)(1), italics added) does not violate the Fifth Amendment. The Court of Appeal reasoned that, as with the notice-of-alibi evidence at issue in *Williams v. Florida*, mere *accelerated* disclosure of mental-state evidence the defendant plans to introduce at trial (but may ultimately decide to forgo) cannot be deemed *compelled* self-incrimination prohibited by the constitutional provision. (*Woods*, *supra*, at pp. 185-186.)

---

[12] In *Wardius v. Oregon* (1973) 412 U.S. 470, the high court decided a question left open in *Williams v. Florida*, *supra*, 399 U.S. 78, ruling that the *due process clause* prohibits the state from requiring pretrial notice of an alibi defense and witnesses *when the state is not required to provide reciprocal discovery to the accused*. Petitioner raises no such due process issue here, nor could he. Section 1054.1 requires the prosecution to disclose to the defendant or his attorney "[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial (*id.*, subd. (a)), and "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations . . . which the prosecutor intends to offer in evidence at the trial" (*id.*, subd. (f)). These provisions afford the accused reciprocal discovery of the prosecution's intended rebuttal witnesses and their statements, sufficient to satisfy the due process concerns addressed in *Wardius*. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 955-957; *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375-377 (*Izazaga*).)

Similar considerations apply in the case before us. Having given notice, under his reciprocal discovery duties, of his intent to present a mental-state defense, petitioner is obliged to submit to an examination by prosecution-retained experts. However, he retains the "unfettered choice" whether to actually present such a defense at trial. If he decides to abandon the defense, any self-incriminating results of the examinations cannot be introduced or otherwise used against him. On the other hand, by electing to present it, he will waive his privilege against self-incrimination to the extent necessary to support his claim and allow fair rebuttal. Forcing him to this choice does not offend the Constitution. If he decides to go forward with the defense, and is thus exposed at trial to self-incriminating direct or rebuttal evidence, that exposure cannot be deemed "compelled" within the meaning of the Fifth Amendment.

If there were no advance disclosure and examination requirement, the Fifth Amendment would not preclude the prosecution from obtaining a midtrial continuance when petitioner proffered his defense, and from then requiring him to submit to examination by prosecution experts as a means of obtaining rebuttal evidence. Insofar as section 1054.3(b)(1) merely accelerates the timing of the examinations, and the disclosure of their results, in order to avoid such midtrial surprise and delay, it similarly does not imperil his constitutional privilege.[13]

---

[13] In *Izazaga*, *supra*, 54 Cal.3d 356, we addressed a claim, among others, that the reciprocal discovery statute violates the Fifth Amendment guarantee against compelled self-incrimination by requiring the defendant to provide the prosecution, not only with the *names and addresses* of witnesses, other than the defendant, that he or she intends to call at trial, but also with "any relevant written or recorded *statements* of those persons." (§ 1054.3, subd. (a)(1), italics added.) We agreed with the petitioner that this broad statutory demand for the "statements" of intended defense witnesses does not satisfy the "accelerated timing" doctrine endorsed in *Williams v. Florida* by merely "forcing [the accused] to divulge at an earlier date information that [he or she] from the beginning

*(Footnote continued on next page.)*

*(Footnote continued from previous page.)*

planned to divulge at trial" (*Williams v. Florida*, *supra*, 399 U.S. 78, 85), because some witness statements whose disclosure is required by section 1054.3, subdivision (a)(1) might never be offered at trial. (*Izazaga*, *supra*, at p. 367.) However, we explained, the statements of third party witnesses, as demanded by the statute, do not, in any event, meet one of the four tests for incriminatory statements protected by the Fifth Amendment — i.e., that they be "(i) 'incriminating'; (ii) 'personal to the defendant'; (iii) obtained by 'compulsion'; and (iv) 'testimonial or communicative in nature' . . ." (*Izazaga*, *supra*, at p. 366) — because the statements of persons other than the accused "are *not* . . . 'personal to the defendant' " (*id.*, at p. 367).

Of course, the recordings and reports of court-ordered mental examinations are likely to contain, or to mention, statements *by the accused to the examiners*. Depending on the exact mental-state defense ultimately presented (if any), at least some of these "personal" statements by the defendant might ultimately not become defense or rebuttal evidence at trial. But that circumstance is not fatal to our analysis in this case. In the first place, our discussion in *Izazaga* of the "accelerated timing" analysis in *Williams v. Florida*, *supra*, 399 U.S. 78, was dictum, since, in *Izazaga*, we found other grounds to reject the Fifth Amendment challenge presented there.

In the second place, *Izazaga*'s analysis of the "accelerated timing" point may have conceded too much by distinguishing *Williams v. Florida* too closely. In applying its "accelerated timing" rationale, the *Williams v. Florida* court assumed that the proper purpose of the Florida statute requiring an accused to provide pretrial discovery of the names and addresses of potential alibi witnesses was to allow the prosecution, "*prior to trial*," to "take the deposition[s] of the witness[es] and find rebuttal evidence." (*Williams v. Florida*, *supra*, 399 U.S. 78, 86, italics added.) Yet the court expressed no concern that some of those potential alibi witnesses, or some of the statements obtained by the prosecution from them, might not figure in the actual trial. On the contrary, as a central tenet of its analysis, the court stressed that, despite his or her pretrial disclosure obligation, the accused could later decide to abandon the proposed alibi defense entirely.

In the third place, even if a defendant's statements to prosecution mental examiners are incriminatory, testimonial, compelled, and personal —thus satisfying the four Fifth Amendment criteria noted by *Izazaga* — our dictum in that decision regarding Fifth Amendment limits on pretrial disclosure does not directly apply to the instant circumstances. In *Izazaga* we confronted a facial Fifth

*(Footnote continued on next page.)*

In an aside, petitioner urges that the reciprocal discovery law itself guarantees his Fifth Amendment right to withhold from the prosecution his potentially self-incriminating statements to prosecution examiners unless and until he waives the constitutional privilege by presenting mental-state evidence at trial. Petitioner points to section 1054.6, which specifies that a defendant is not required to disclose, inter alia, "any materials or information which . . . are privileged pursuant to an express statutory provision, or are privileged as provided by the Constitution of the United States." As is plain from its language, however, section 1054.6 merely protects those "privilege[s]" the Constitution or statutes themselves afford, and thus imposes no *broader* restrictions on pretrial discovery than the Constitution, or the statutes defining privileges, otherwise require. As we have seen, the Fifth Amendment does not provide a privilege against the compelled "disclosure" of self-incriminating materials or information, but only precludes the use of such evidence in a criminal prosecution against the person from whom it

---

*(Footnote continued from previous page.)*

Amendment challenge to statutory requirements for pretrial disclosure. We had no occasion in *Izazaga* to address specific situations such as that presented here, where the defendant has given notice of an anticipated waiver of his or her Fifth Amendment privilege.

Finally, as explained elsewhere in this opinion, the prosecution's pretrial access to materials derived from mental examinations conducted under section 1054.3(b) does not contravene the constitutional privilege for another reason that has become clearer since *Williams v. Florida* and *Izazaga* were decided. This reason is that the Fifth Amendment does not directly prohibit official compulsion to provide "testimonial" *disclosure* of personally incriminating information; it merely bars the *use*, direct or derivative, of such a compelled disclosure in a subsequent criminal prosecution against the person from whom it was obtained.

was compelled. Accordingly, nothing in section 1054.6 exempts the results of the prosecution examinations from pretrial discovery.[14]

Nor is our conclusion altered by consideration of Evidence Code section 940 (not cited by petitioner or the Court of Appeal majority), which provides that "[*t*]*o the extent that such privilege exists* under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." (Italics added.) As its language suggests, this statute "does not determine the scope of the privilege against self-incrimination," its exceptions, or the circumstances of its waiver; those matters are determined by the federal and state Constitutions themselves "as interpreted by the courts." (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 940, p. 283.) To the extent the Fifth Amendment provides no

---

[14]    Two Court of Appeal decisions, *Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260 (*Rodriguez*) and *Andrade v. Superior Court* (1996) 46 Cal.App.4th 1609, have held that section 1054.6 absolves the defendant from disclosing, prior to trial, the otherwise discoverable written or recorded statement of an expert witness he or she intends to call (§ 1054.3, subd. (a)(1)) if the statement includes or discusses communications from the defendant to the expert that are protected by the statutory *attorney-client* privilege. This privilege, unlike that provided by the Fifth Amendment, is one of true *confidentiality*. Unless and until waived, it protects against *any and all disclosure* of most communications from a client to his or her lawyer, or to a third person to whom the communication is necessary for "accomplishment of the purpose for which the lawyer is consulted." (Evid. Code, § 952; see also Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 952, p. 307 [privilege covers client's disclosures to expert consultant, such as physician, for purposes of assisting counsel in advising client].) But neither the attorney-client privilege, nor any other privilege of true confidentiality, is at issue here. Petitioner has never claimed that his examination by prosecution experts might involve the disclosure of private communications to his counsel, as to which confidentiality has not been waived, or of attorney work product, and the Court of Appeal majority did not devise its prophylactic measures with those issues in mind.

28

absolute privilege against disclosure of potentially self-incriminating information, neither does Evidence Code section 940.

In determining that prophylactic measures, including provisions for delayed and redacted disclosure of the examination materials, are nonetheless necessary to protect petitioner's Fifth Amendment rights, the instant Court of Appeal majority expressed two general constitutional concerns about court-ordered pretrial examinations by prosecution experts.

First, the majority posed the problem of keeping the examinations themselves strictly relevant to the mental-state defense petitioner intends to present, and thus within the terms of the limited Fifth Amendment waiver such a defense would entail. For example, the majority suggested, unless this intended defense relates to the facts and circumstances of the charged crimes, or to the accused's feelings and attitudes about the crimes, questions on these subjects by the prosecution examiners may infringe upon petitioner's Fifth Amendment rights. (Citing, e.g., *U.S. v. Johnson* (N.D. Iowa 2005) 383 F.Supp.2d 1145, 1154-1163 (*Johnson*) [prosecution experts' right to ask questions about charged crime depends on the questions' relation to specific mental defense accused intends to offer]; *Traywicks v. State* (Okla.Crim.App. 1996) 927 P.2d 1062, 1063-1064 [where accused raised mental defect and alcoholism as defenses, and did not discuss crimes with defense examiners, defendant did not have to answer crime-related questions during court-ordered mental examination].)

The Court of Appeal majority disclaimed any attempt, on the incomplete record before it, to delineate the proper scope of questioning by the court-appointed prosecution experts in this case. Nonetheless, the majority ruled that, once the court-ordered examinations are concluded, "the permissible *scope of disclosure*" to the prosecution must depend on whether particular information

29

from the examinations is "necessary to render a reliable and informed opinion on the mental condition issue raised by [petitioner]." (Italics added.)

Second, the Court of Appeal majority worried that unless the examination materials are purged of all Fifth Amendment-privileged information before their release to the prosecution, they may be used to seek out *other evidence* of petitioner's guilt — evidence unrelated to rebutting his mental-state defense — for presentation at his trial. Rather than burden petitioner, and interrupt the trial, with later litigation over whether such derivative use of the examination materials has led to the prosecution's presentation of "forbidden fruit," the Court of Appeal majority concluded that it is better, in the first instance, to limit the prosecution's opportunity to exploit the examinations beyond their proper purpose.

We do not believe these concerns justify the measures devised by the Court of Appeal majority — measures that may seriously undermine the prosecution's fair opportunity to rebut a mental-state defense proffered by petitioner at trial. In the first place, the Court of Appeal majority's procedures require the trial court to resolve petitioner's privilege claims before it has heard his actual mental-state case, as presented at the trial itself. Forced to work with incomplete information in advance of trial, the court risks deciding the privilege issues erroneously, and may wrongly rule that portions of the examinations are inadmissible, even though, as it later turns out, the prosecution could properly have used them to rebut the ultimate defense evidence.

This danger is greatly compounded because the Court of Appeal majority's ruling would unfairly deny the prosecution *all access* to its potential rebuttal evidence until after the trial court has ruled on petitioner's claims of privilege. Hence, the prosecution would be deprived of the opportunity to litigate the privilege issues with full knowledge of the evidence in dispute, and prosecutors would never know what potentially useful rebuttal evidence, obtained by their own

30

experts pursuant to court order, had been kept from them. The absence of a fully informed, two-sided debate on the Fifth Amendment privilege issues raised by the court-ordered examinations constitutes an additional, and substantial, obstacle to their fair and accurate resolution.

The Court of Appeal majority suggested that one-sided pretrial redaction procedures, such as the one it ordered, are neither unprecedented nor beyond the competence of trial courts. But such procedures are usually employed to protect privileges of *true confidentiality* — i.e., rights which, unless waived or otherwise limited, preserve particular information from *all compelled disclosure*. (See, e.g., *In re Lifschutz* (1970) 2 Cal.3d 415, 437, fn. 23 [in camera review to determine scope of patient-litigant exception to psychotherapist-patient privilege]; Evid. Code, §§ 915, subd. (b) [in camera review of allegedly privileged materials where necessary to rule on work-product or other nondisclosure privileges limited by requirements of justice], 1045, subd. (b) [in camera review of confidential peace officer personnel records to rule on "relevance" exception for complaints, investigations, or discipline against officer].) If information entitled to true confidentiality is mistakenly disclosed, the disclosure itself breaches the privilege, the "cat is out of the bag," and the damage cannot be undone. Careful advance screening may be the only means of guarding against this danger.

By contrast, the Fifth Amendment privilege against self-incrimination does not target the mere compelled *disclosure* of privileged information, but the ultimate *use* of any such disclosure in aid of a criminal prosecution against the person from whom such information was elicited. Advance redaction is not the only, or even the best, means of safeguarding this privilege. That is especially true where, as here, the screening court must attempt to resolve complicated issues about partial waivers of the privilege that will occur only if, when, and to the extent a particular defense is presented in the trial itself. Preservation of the

privilege against self-incrimination does not require that trial courts be taxed with such difficult and uncertain duties.[15]

Nor are we persuaded by the Court of Appeal majority's efforts to prevent the prosecution's use of "tainted" evidence derived from the examinations. The pretrial screening and redaction procedures devised by the Court of Appeal majority stem from an unjustified *assumption* that, absent such redaction, the prosecution will exploit the examination materials for improper purposes. One consequence of this misguided approach, as noted above, is a substantial danger that the redaction process, conducted without full and fair participation by the prosecution, and before the defense has actually presented its mental-state case at trial, will be overbroad, and will thus leave the prosecution with insufficient information to prepare a legitimate rebuttal case.

Generally, therefore, the proper balance between the competing interests is best maintained by resolving Fifth Amendment privilege issues arising from section 1054.3(b)(1) mental examinations after the prosecution has obtained unredacted access to the examination materials. Fair procedures are available to ensure that a defendant's Fifth Amendment rights are not infringed at the trial by prosecutorial misuse of these materials. For example, once the prosecution has received them, the trial court is free to entertain a defense motion in limine to limit

---

[15] Section 1054.3(b)(1) actually includes a *preexamination* screening provision designed to help keep court-ordered examinations by prosecution-retained experts within relevant bounds. Subdivision (b)(1)(B) provides that "[t]he prosecuting attorney shall submit a list of tests proposed to be administered by the prosecution expert to the defendant . . . . At the request of the defendant . . . , a hearing shall be held to consider any objections raised to the proposed tests before any test is administered. Before ordering that the defendant submit to the examination, the trial court must make a threshold determination that the proposed tests bear some reasonable relation to the mental state placed in issue by the defendant . . . ."

32

their use at trial. If the defense desires such pretrial assurances against improper use, it must, of course, provide the court, and the prosecution, with the details of its anticipated mental-state defense sufficient to permit fully informed argument and resolution of the privilege issues. Both parties, with full access to the examination materials, can then debate how those materials may apply as fair rebuttal to this defense. The court can issue all appropriate protective orders against improper use, both direct and derivative, of evidence derived from the examinations.[16]

Alternatively, the defense can raise its privilege arguments at the trial itself. Once the defendant has presented his or her mental-state evidence, and the prosecution commences its rebuttal case, the defense can raise specific objections to particular evidence from the section 1054.3(b)(1) examinations the prosecution seeks to introduce. At this stage, the court is in the best possible position to determine whether particular rebuttal evidence proffered by the prosecution exceeds the scope of the defendant's Fifth Amendment waiver.

Moreover, the cases have developed a well-established framework for resolving "forbidden fruit" issues at trial. Under this scheme, if the defendant claims that all or some portion of the prosecution's case was obtained by constitutionally improper means, the defendant "must go forward with specific evidence demonstrating taint," after which the government "has the ultimate burden of persuasion to show that its evidence is untainted." (*Alderman v. United States* (1969) 394 U.S. 165, 183 [evidence obtained by illegal search]; see, e.g.,

---

[16]     As with many limine rulings on the admissibility of evidence, the court's pretrial privilege determinations necessarily would be preliminary, and must be subject to reconsideration if the circumstances at trial differ significantly from those anticipated at the time of the motion.

*U.S. v. Hall* (5th Cir. 1998) 152 F.3d 381, 399, cert. denied *sub nom. Hall v. U.S.* (1999) 526 U.S. 1117 (*Hall*) [evidence derived from court-ordered psychiatric exam]; see also *U.S. v. Allen* (8th Cir. 2001) 247 F.3d 741, 773-774, judgment vacated and cause remanded on other grounds *sub nom. Allen v. U.S.* (2002) 536 U.S. 953 (*Allen*) [same].)[17]

---

[17] Where, in one proceeding, a witness has provided self-incriminating testimony pursuant to a grant of immunity, then is later prosecuted on related charges, he or she need only point to the earlier immunized testimony in order to shift to the prosecution "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." (*Kastigar*, *supra*, 406 U.S. 441, 461-462; see also *Murphy v. Waterfront Comm'n* (1964) 378 U.S. 52, 79, fn. 18.) In such a case, the previously immunized witness is being prosecuted, on matters related to his or her immunized testimony, by officials who have *no legitimate basis to possess or use* that testimony. The suspicions aroused by such a situation may justify a broad presumption of improper use. In the instant case, by contrast, there is nothing presumptively improper about the prosecution's access to the results of its own experts' mental examinations of petitioner, conducted pursuant to court order. The prosecution may use those results, including petitioner's statements to the examiners, as necessary to rebut any mental-state defense he voluntarily presents. Under these circumstances, it is doubtful that mere pretrial disclosure to the prosecution of the unredacted examination results should force the prosecution to justify the independent basis for its entire case. (See, e.g., *U.S. v. Stockwell* (2d Cir. 1984) 743 F.2d 123, 126-127 [prosecutors' direct observation of court-ordered insanity examination would not, without more, require prosecution to prove independent basis for its evidence].)

In any event, the scope of legitimate dispute about the source of prosecution evidence seems sharply reduced where, upon probable cause, an indictment or information has already been filed against the accused, reciprocal discovery is already under way, and the defendant has given notice of intent to present a mental-state defense, *before* the prosecution obtains the court-ordered examinations that might give rise to "forbidden fruit." Moreover, the subject matter of the examinations is confined to the accused's mental state at the time of the charged crimes. While this issue may sometimes involve statements by the accused to the examiners about the crimes themselves, often it will not. Contrary to the speculation of the Court of Appeal majority, we are not convinced that midtrial claims of tainted evidence arising from court-ordered mental

*(Footnote continued on next page.)*

Finally, current rule 12.2 of the Federal Rules of Criminal Procedure (rule 12.2), cited by petitioner and the Court of Appeal majority, does not persuade us to contrary conclusions. Before 2002, as now, rule 12.2 provided that a defendant who intends to present an insanity defense, or a mental-state defense bearing on guilt, must notify a government attorney, whereupon the government may move for a court-ordered mental examination. Then, as now, the rule further specified that the government may not make direct or derivative evidentiary use of such an examination except to rebut mental-state evidence actually presented by the defendant. (Fed. Rules Crim.Proc., former rule 12.2(a)-(c), 18 U.S.C. (1994 ed.) p. 749.)

The rule was amended in 2002 to authorize a similar court-ordered mental examination when the accused in a *capital case* provides required notice of an intent to present mental-state evidence on the issue of *punishment*. The amended rule further declares that the results of any such examination *related solely to penalty* "must be sealed and must not be disclosed to any attorney for the government or the defendant" until after he or she is found guilty and thereafter confirms an intent to present mental-state evidence at the penalty trial. (Fed. Rules Crim.Proc., rule 12.2(c)(2), 18 U.S.C.; see *id.*, rule 12.2(b).)[18]

---

*(Footnote continued from previous page.)*

examinations will present serious and widespread obstacles to the efficient conclusion of the trial proceedings.

[18] For California purposes, we have held that, while the requirements of timely reciprocal pretrial discovery, as set forth in section 1054.3, apply to the penalty phase of a capital case, the trial court has *discretion* to delay prosecution discovery of defense penalty evidence until after conclusion of the guilt trial. (*People v. Superior Court (Mitchell)* (1993) 5 Cal.4th 1229, 1239.)

This "seal and gag" provision was intended to avoid the consumption of time and resources that might arise if the government "obtains early access to the accused's statements" and then is "required to show that it has not made any derivative use of that evidence." (Com. Notes on Rules—2002 Amendment, Fed. Rules Crim.Proc., 18 U.S.C. (2006 ed.) foll. rule 12.2, p. 71.)[19] Notably, however, the amended rule *only* delays the government's access to court-ordered pretrial mental examinations bearing *solely* on the issue of *penalty in a capital case*, and does so *only* until the guilt trial is complete and the defendant confirms an intent to proceed with mental-state evidence at the penalty phase.

The competing interests may justify the limited restrictions imposed by amended rule 12.2. Depending on the verdict at the guilt phase of a capital trial, the case may never proceed to a penalty phase. Under such circumstances, it may not be unfair to delay the prosecution's discovery of potentially incriminating penalty evidence —evidence for which the prosecution has no legitimate need or use at the guilt phase — until the need for a penalty trial becomes clear.

---

[19] Prior to the 2002 amendment of rule 12.2, several federal courts, concerned about the government's potential improper use, on the issue of guilt, of statements by capital defendants during court-ordered mental examinations pertinent only to penalty, had similarly specified that the government should have no access to information about such examinations until after the defendant's conviction at the guilt phase. (E.g., *U.S. v. Minerd* (W.D.Pa. 2002) 197 F.Supp.2d 272, 278; *U.S. v. Edelin* (D.D.C. 2001) 134 F.Supp.2d 45, 55; *U.S. v. Beckford* (E.D.Va. 1997) 962 F.Supp. 748, 764; *U.S. v. Haworth* (D.N.M. 1996) 942 F.Supp. 1406, 1408; *U.S. v. Vest* (W.D.Mo. 1995) 905 F.Supp. 651, 654.) However, other courts have seen no necessity for such restrictions, finding sufficient Fifth Amendment protection in the normal trial procedures for resolving claims of tainted evidence. (*Hall*, *supra*, 152 F.3d 381, 399; see *Allen*, *supra*, 247 F.3d 741, 773-774; *Phillips v. Araneta* (Ariz. 2004) 93 P.3d 480, 483-484 [federally devised "seal and gag" procedures generally not required even where penalty-specific prosecution mental examinations precede defendant's conviction].)

Even so, nothing in amended rule 12.2 bars the government from receiving penalty-specific examination results *in advance of the penalty trial itself*, so that it has ample time to prepare a rebuttal to the defense's anticipated penalty case. Moreover, the 2002 amendment to rule 12.2 placed *no* limits on the government's right to pretrial discovery of mental-examination evidence pertinent to the issue of *guilt*. There, the balance is altered; a trial on that issue is certain, and the defendant has already indicated his or her intent to defend the pending charges with mental-state evidence. In this situation, imposing delay on prosecutorial access to evidence that might rebut such a defense is neither fair nor appropriate. (See, e.g., *U.S. v. Taveras* (E.D.N.Y. 2006) 233 F.R.D. 318, 322; *State v. Martin* (Tenn. 1997) 950 S.W.2d 20, 24-25.)[20]

Nor does rule 12.2 provide for advance screening and redaction of the examination materials before they are released to the prosecution for use in rebuttal. As explained above, a pretrial screening procedure that occurs before the accused has fully revealed his or her mental-state defense, and without prosecutorial access to the evidence in dispute, creates the danger of overbroad

---

[20]    Amici curiae California Public Defenders Association and Ventura County Public Defender invite our attention to "firewall" procedures adopted by some federal courts under the "seal and gag" provisions of amended rule 12.2, as applicable to capital penalty evidence. Under these procedures, advance prosecutorial access to the results of court-ordered mental examinations pertinent only to sentencing is limited to "firewall" attorneys or "taint teams," prosecutors otherwise unconnected to, and insulated from, the criminal case, who are appointed solely to manage the examinations. (See, e.g., *Johnson*, *supra*, 362 F.Supp.2d 1043, 1084; *U.S. v. Sampson* (D. Mass. 2004) 335 F.Supp.2d 166, 244-245.) But no sound reason appears to apply such procedures where, as here, the prosecution requires timely access to the examinations to prepare its rebuttal to anticipated defense evidence *on the issue of guilt*.

37

restrictions on the prosecution's access to evidence it needs, and to which it is entitled, to rebut the case actually presented.

For all these reasons, we are persuaded that neither the Fifth Amendment right against self-incrimination, nor prophylactic concerns about the protection of that right, justify precluding the prosecution from full pretrial access to the results of mental examinations by prosecution experts conducted, pursuant to section 1054.3(b)(1), for the purpose of obtaining evidence to rebut a mental-state defense the defendant has indicated he or she intends to present on the issue of guilt. We conclude that the Court of Appeal majority erred in ordering such restrictions in this case.[21]

### 3. Sixth Amendment.

In a single paragraph of his brief on the merits, petitioner urges that advance prosecution access to the examination materials would also violate his *Sixth Amendment right to counsel* by making prosecutors privy to the information petitioner and his counsel must review in order to decide whether to present a mental-state defense. Though he occasionally referred below to the Sixth Amendment, he never made an argument even as developed or coherent as that presented here. The Court of Appeal majority concluded that petitioner's "Sixth Amendment objections are obviated or adequately addressed by the ability of the defense to monitor the examinations, *and* to interpose timely objections to disclosure of statements which [petitioner] may make."

---

[21]    We conclude only that there appears no *general* constitutional or prophylactic reason to impose the access restrictions proposed by petitioner or adopted by the Court of Appeal majority. Nothing we say here is intended to suggest that a trial court may not address specific, as-yet-unforeseen problems that might arise in the course of particular examinations.

38

Petitioner's argument is, in any event, unmeritorious as presented here. The very purpose of mental examinations ordered by the court under section 1054.3(b)(1) is to provide *the prosecution* with a fair opportunity to rebut mental-state evidence the defense has already indicated it intends to present. They are not analogous to confidential consultations between the defendant and his or her attorney, from which prosecutors must be excluded. As we long ago made clear, such examinations do not violate a represented defendant's right to counsel so long as counsel is notified in advance of examination appointments and their purpose, and has the opportunity to consult with the client before they occur. (*In re Spencer* (1965) 63 Cal.2d 400, 412.) Nothing in United States Supreme Court cases suggests that more is required. (See *Powell v. Texas* (1989) 492 U.S. 680, 685; *Satterwhite v. Texas* (1988) 486 U.S. 249, 254-255; *Buchanan*, *supra*, 483 U.S. 402, 424-425; *Estelle*, *supra*, 451 U.S. 454, 471.)[22]

---

[22]    We note that portions of the trial court's order left undisturbed by the Court of Appeal majority provide that defense counsel (1) must receive reasonable notice of when examinations are to occur, (2) may, along with a defense expert, monitor the examinations in real time, and (3) must have prompt postexamination access to all examination materials.

## CONCLUSION

The judgment of the Court of Appeal is reversed with directions to deny the petition for mandamus.

BAXTER, J.

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY LIU, J.**

The court's opinion today holds that neither the Fifth Amendment nor the Sixth Amendment requires trial courts, as a general rule, to impose protective measures when the prosecution seeks to have the defendant examined by the prosecution's proposed expert to rebut a defendant's asserted mental health defense. I agree that such protections are not required in this case.

However, the court's opinion leaves the window open for trial courts to impose protections as necessary to avoid misuse of such examinations in a particular case. (Maj. opn., *ante*, at p. 38, fn. 21.)

In this case, the trial court found no need for protections beyond the general prohibition that the prosecution may not make direct or derivative use of the fruits of the examination. Here, the prosecution already has access to police interviews in which defendant recounted his version of the crime, and defendant does not raise particular concerns about the nature of the tests or the practices of the expert that would suggest an ulterior motive by the prosecutor. Nor is there any specific indication that defendant is unable to avoid making prejudicial or incriminating statements unrelated to his mental health defense. In sum, defendant's rights appear to be adequately protected by the general rule prohibiting the prosecution from making direct or derivative use of the examination except as necessary to rebut any mental health defense.

1

But this may not always be so. There may be cases in which the defendant has refused to make any statements to law enforcement, and thus the proposed mental examination might appear to serve as a surrogate for police interrogation. In other cases, the practices of the expert or the nature of the tests might suggest that the examination is more akin to an investigatory device than a procedure to allow the prosecution fair opportunity to rebut an anticipated mental health defense. Or a defendant's attorney may show that the defendant simply cannot stop talking and will infuse the examination with such prejudicial and inculpatory information that it is impossible to unring the bell. By implication, our rule prohibiting direct and derivative use except as necessary to rebut defendant's mental health defense is premised on the possibility that the examination may yield information useful to the prosecution beyond that limited purpose. And it is impossible for us today to anticipate the extent to which a particular examination might color, however innocently or subtly, the way a prosecutor frames the case, selects witnesses, or presents the evidence.

Under our direct and derivative use doctrine, the prosecutor bears the burden to establish that evidence presented outside of rebuttal was derived from an independent source and not the compelled examination. (Maj. opn., *ante*, at pp. 33–34.) When coupled with pretrial motions in limine to prevent obvious misuse, this basic rule will often suffice. In other cases, however, enforcing the bar against direct or derivative use at trial might be an inadequate or inefficient remedy. The trial court retains broad discretion, consistent with our opinion today, to decide whether and to what extent protective measures may be warranted in a particular case to ensure that any use of the examination by the prosecution is limited to rebuttal of a mental health defense.

LIU, J.

I CONCUR: WERDEGAR, J.

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Maldonado v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 184 Cal.App.4th 739
**Rehearing Granted**

_____

**Opinion No.** S183961
**Date Filed:** April 23, 2012

_____

**Court:** Superior
**County:** San Mateo
**Judge:** Mark R. Forcum

_____

**Counsel:**

Paul F. DeMeester, under appointment by the Supreme Court, for Petitioner.

Law Offices of J.T. Philipsborn and John T. Philispborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner.

Stephen P. Lipson, Public Defender (Ventura) and Michael C. McMahon, Chief Deputy Public Defender, for California Public Defenders Association and Public Defender of Ventura County as Amici on behalf of Petitioner.

No appearance for Respondent.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman, Brent W. Wilner, Laurence K. Sullivan and Jeffrey M. Laurence, Deputy Attorneys General, for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul F. DeMeester
1227 Arguello Street
Redwood City, CA  94063
(415) 305-7280

Jeffrey M. Laurence
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5897