Filed 2/18/16  P. v. Batten CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050277 |
| v. | (Super. Ct. No. 11HF1885) |
| TRAVIS DEWAYNE BATTEN, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson and Patrick Donahue, Judges.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Travis Dewayne Batten, Jr., was found guilty of a number of sex offenses after trial by jury. He raises two issues on appeal: (1) That the police obtained his DNA as a result of a prolonged detention in violation of the Fourth Amendment, and with the suppression of that evidence there was insufficient evidence to convict him of any of the charges; and (2) Even if the DNA evidence is not ordered suppressed, the evidence was insufficient to support his conviction for kidnapping.

Defendant had been lawfully detained for driving with illegally tinted windows. He asks us to conclude the detention was unduly prolonged by police so they could surreptitiously obtain his DNA from a breath test straw and that introduction of his DNA obtained from the straw prejudiced him at trial. Defendant is correct that the DNA sample was obtained in violation of his Fourth Amendment rights and that evidence should have been suppressed. The error was harmless, however, because a buccal swab containing his DNA was taken when he was arrested days after the traffic stop. Defendant did not challenge the lawfulness of his arrest. Needless to say, the DNA profiles obtained from the breath tests straw and the buccal swab were the same. Defendant's DNA from the buccal swab matched the DNA samples left on each victim by their attacker. Additionally, defendant left his thumbprint on the duct tape he used to bind one of the victims.

We also find the evidence supports the kidnapping charge. Accordingly, we affirm the judgment.

I

FACTS

The district attorney charged defendant in the information with a number of offenses arising out of two instances involving two different female victims. Based on a May 20, 2005 incident, defendant was charged with one count each of residential

2

burglary (Pen. Code,[1] §§ 459, 460, subd.(a); count one), kidnapping to commit a sex offense (§ 209, subd. (b)(1); count two), assault with intent to commit a sex offense (§ 220; count three), and dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count four).  Based on a November 30, 2006 incident, defendant was charged with penetration with a foreign object (§ 289, subd. (a)(1); count five), two counts of forcible rape (§ 261, subd. (a)(2); counts six and eight), forcible sodomy (§ 286, subd. (c)(2); count seven), and assault with intent to commit a sexual offense during a first degree burglary (§ 220, subd. (b); count nine).[2]

After the prosecution's case-in-chief, the court dismissed counts one and four pursuant to defendant's section 1118.1 motion because the applicable statute of limitations had expired before those charges were filed.  The jury convicted defendant on the remaining counts (counts two, three, and five through nine) and found the special sentencing allegations true.

The court sentenced defendant to life in prison with the possibility of parole on count two (kidnapping to commit sex offense).  On counts five (penetration with a foreign object), six (forcible rape), seven (forcible sodomy), and eight (forcible rape), the court sentenced defendant to four consecutive terms of 25 years to life, for a total commitment of life with a consecutive term of 100 years to life.  The sentences on counts three (assault with intent to commit a sex offense) and nine (assault with intent to commit a sex offense during commission of a first degree burglary) were ordered stayed pursuant to section 654.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Four charges and their attendant special allegations based on an alleged July 8, 2010 incident involving a third alleged victim were dismissed prior to trial on the district attorney's motion.

3

*Counts Two and Three*

In May 2005, Karen S. lived alone in a second floor condominium in Newport Beach. Her garage was on the street level. On May 20, 2005, she returned home at approximately 8:00 p.m., after working out at the gym and grocery shopping. The front door was not locked because Karen had been having trouble with the lock. Upon entering her residence, Karen heard a noise and saw something to her left, out of the corner of her eye. It was a man wearing a dark mask that covered his head, except for his eyes. Although she could not see his face, Karen saw the man's arms and believed he was Caucasian.

The intruder lunged at Karen and tackled her before she could go back out the front door. He said he was there to rob her, and something about being in the wrong house. He said he was going to "hog-tie" her and if she cooperated, she would be alright. The man then pulled Karen to inside a bedroom about six or seven feet from where he had tackled her, pushed her onto the bed in the room, duct taped her arms behind her back, wrapped duct tape around her mouth and head, and said he would hurt her if she did not cooperate. He also said something about a knife.

The man said he heard a noise in the back of the house and asked if anyone else was in the residence. He moved Karen into the hallway and toward the back bedroom. Feeling she was not going to be robbed, Karen attempted to bargain with the man, offering him her Mercedes and her purse. He pushed Karen into the master bedroom and put her on the left side of the bed, about 30 feet from where they were when he duct taped her mouth. No lights were on and it was dark in the master bedroom. It had been lighter where the man first tackled Karen.

Karen was seated on the side of the bed and face-to-face with the intruder. He lifted her light sweatshirt and started to lick her breasts. He told her not to look at him. He also said something about having been in jail and that he was lost. Karen feared for her life and started fighting. The man punched her. She struggled to stay conscious.

4

At one point during the struggle, he was on top of Karen and put his hand between her legs over her shorts. The struggle lasted about five minutes. Karen attempted to chew her way through the duct tape covering her mouth, but felt no one would hear her scream because she was so far away from the front door.

The intruder threw Karen to the ground and told her he would return if she called the police. He left and when she heard the front door close, Karen freed herself and called 911. When the police arrived, a female officer cut the duct tape off of Karen and preserved the tape for any biological evidence. She also took swabs from areas the intruder licked on Karen's breasts. The swabs were subsequently submitted to the Orange County's crime lab for DNA analysis.

Later that night, about 11:50 p.m., defendant went to an emergency room for what was diagnosed as a fracture of his fourth metacarpal of his right hand, for what is known as "boxer's fracture." The term refers to poor boxing skills. Defendant told the treating physician he had injured his hand at work when a cylinder fell on his hand. When defendant went to work at Fletcher Jones Motor Cars on May 23, 2005, he had a bandage on his right hand and claimed to have been in a bar fight over the weekend.

Karen drove a Mercedes she had purchased from the Fletcher Jones dealership. She had the car serviced there a number of times in 2005.

*Counts Five Through Nine*

Danielle F. was a receptionist at a gym in November 2006. She lived in a studio apartment while attending school. On November 30, 2006, she went out for dinner with her boyfriend and other friends. After dinner she went with her boyfriend to his apartment for a while before returning home to write a paper for school. After working on the paper for "a long time," Danielle decided to take a shower and return to her boyfriend's residence. It was about 11:00 p.m. or later. Danielle did not remember whether her front door was locked or unlocked.

5

Danielle was in the shower for about 15 to 30 minutes. She got out and put a towel around her before she began brushing her hair. Her cell phone rang and when she went to answer it, a man lunged at her and tackled her. He came at her from the direction of the front door. The man wore a white T-shirt and jeans. There was "something wrapped around his face." It appeared to be a ripped cloth or T-shirt type material and was "pinkish orange." Danielle could only see his eyes, hair, and arms.

The intruder used zip ties to tie Danielle's arms behind her back as soon as he took her to the ground. She screamed and the man commented that it was loud and he hoped nobody heard. The man made Danielle get up and turn off all the lights in the apartment. She did as she was told. He left the television on and made Danielle lay face down on the ground. Once she was on the ground, the man asked her if it had been her boyfriend who called her cell phone. He asked Danielle her name, and she told him.

Danielle started to fight back when the man began touching her breasts. He tore the towel off her, put his hands around her neck, and threatened to choke her or break her neck. She was still on her stomach when the intruder began to rape her. He sodomized her as well, but she jumped because it hurt. The male then entered her vagina again. The man climaxed onto Danielle's back. He cleaned Danielle off with a towel. He got a pair of scissors, cut off the zip ties, and took Danielle back to the shower, and asked her to get inside. Danielle knew any DNA evidence was on her back, so she made sure to only wash the front of her body. When she got out of the shower, he was gone and the back door slider was open.

Danielle got dressed and went to her boyfriend's residence, where a friend called 911. She returned to her apartment with a police officer. Danielle noticed the towel she had been wearing was missing. The zip ties were gone too. She then went to the hospital where multiple swabs were taken. The swabs were booked into evidence for later testing.

*The Investigation and Other Evidence*

On July 11, 2011, Irvine Police Officer Erika Hutchcraft, who was one of the investigating officers on the incident involving Danielle, observed a dark gray Chevrolet Silverado pickup truck with dark tinted windows driving on the street that surrounds the apartment complex in which Danielle lived. About half an hour later, she saw the pickup driving through the apartment complex. Hutchcraft's partner noted the license plate number of the pickup and a subsequent DMV check disclosed the truck was registered to defendant. Hutchcraft also obtained defendant's photograph and a digital photograph of his right thumbprint.

A fingerprint expert was then asked to compare a fingerprint lifted from the duct tape used on Karen with a defendant's thumbprint from DMV. The expert found 15 points of similarity between the two prints and concluded the latent print on the duct tape was left by defendant. The latent was also compared with thumbprint from defendant's citation for tinted windows and once defendant was arrested, with his rolled prints. They all matched.

On July 14, 2011, defendant's pickup truck was stopped by Irvine Police for tinted windows and issued a citation. The car stop with its attendant citation was a ruse to give the police an opportunity to surreptitiously obtain a DNA sample from defendant. When the attempt to get defendant to lick his thumb before putting his thumbprint on the ticket failed, the police decided to attempt to get defendant to take a breath test with a preliminary alcohol screening (PAS) device. Defendant agreed to take the test. He took the first test, waited two minutes, and took the test a second time. Detective Victoria Hurtado requested the crime lab process the PAS straws for DNA and if DNA was retrieved, to compare it with the DNA profile from Karen and Danielle's cases.

On July 19, 2011, a search warrant issued for defendant's home, pickup truck, and his workplace at Fletcher Jones. Bundles of zip ties were found in his truck

and in his workplace at Fletcher Jones.

On July 20, 2011, at about 10:00 a.m., Hurtado got a call back from the crime lab. Defendant was arrested later that day.

The crime lab analyzed the swab samples obtained from Karen's right breast and Danielle's back, the sample obtained from a PAS straw, and the sample obtained from a buccal swab sample taken from defendant on the day of his arrest. The breast swab was compared to the back swab: both contained DNA from the same male. The frequency of randomly obtaining such a result was one in one trillion. The DNA sample obtained from Karen's breast was compared to defendant's DNA obtained from the PAS straw. It was a match. The DNA obtained from the swab of Danielle's back was compared to the defendant's DNA from the PAS straw. It matched too. The DNA from the PAS straw matched the DNA from the buccal swab obtained on the date of defendant's arrest.

II

DISCUSSION

A. *Sufficiency of the Evidence*

Defendant contends the evidence does not support his conviction for kidnapping (count two). We disagree.

In reviewing whether the evidence supports a verdict, we "review[] the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable" fact finder could find beyond a reasonable doubt the accused violated the charged statute. (*People v. Rountree* (2013) 56 Cal.4th 823, 852-853.) We "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If such evidence is found to exist, it does not matter that the evidence could also be consistent with innocence. (*People v. Farris* (1977) 66 Cal.App.3d 376, 383.)

8

Defendant was convicted in count two of the information with violating section 209, subdivision (b)(1). "Any person who kidnaps or carries away any individual to commit robbery, rape, spousal rape, oral copulation, sodomy, or any violation of Section 264.1, 288, or 289, shall be punished by imprisonment in the state prison for life with the possibility of parole." (§ 209, subd. (b)(1).) In order to violate this provision, the defendant must have moved the victim a substantial distance and in doing so, "'*substantially* increased the risk of physical or psychological harm to the person beyond that necessarily present in the rape or sexual penetration.'" (*People v. Robertson* (2012) 208 Cal.App.4th 965, 987.) Additionally, "'[w]here a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape.' [Citation.]" (*Id*. at p. 984.)

The crime of kidnapping for purposes of rape requires the jury to initially find the movement of the victim was not "merely incidental" to the rape. (*People v. Robertson*, *supra*, 208 Cal.App.4th at p. 983.) If this first element is met, the jury must then decide whether the movement increased the risk of harm over than necessarily present in the rape. (*Ibid*.) The evidence supports the jury's determination that both elements were proven.

"'Where the movement changes the victim's environment, it does not have to be great in distance to be substantial.' (*People v. Shadden* [(2001) 93 Cal.App.4th [164,] 169, 167–169 [dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her was sufficient to support aggravated kidnapping conviction]; *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594 [moving victim 40 to 50 feet from driveway that could be viewed from the street into a camper at the rear of the house for the purpose of rape was sufficient to support aggravated kidnapping conviction]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 348–349 [movement of victim 29 feet from outside walkway to bathroom of motel room for the purpose of rape was sufficient to support aggravated kidnapping conviction].)" (*People*

9

*v. Robertson*, *supra*, 208 Cal.App.4th at p. 986.)

Here, defendant confronted and tackled Karen just inside the door to her residence. After that, he dragged her six or seven feet into an adjacent area of the apartment where he tied and bound her. Then, he took her to the bedroom at the back of the residence, about 30 feet from the front door where he initially assaulted her. This distance increased the risk of harm to Karen. Having been moved such a distance from the front door, Karen felt it would have been useless to scream because no one would hear her so far from the front door. The movement to the back of the residence decreased the chance of detection. The movement from the front door, where Karen may have been heard had she called out, to the back bedroom and a point where she felt no one would hear her if she screamed, changed the physical and psychological environment where defendant sexually assaulted her. (*People v. Robertson*, *supra*, 208 Cal.App.4th at p. 987.) The evidence supports the conviction.

B. *The Motion to Suppress Evidence*

Defendant's second issue is more difficult. Defendant filed a motion to suppress evidence pursuant to section 1538.5 for a purported violation of his Fourth Amendment right to be free from unreasonable searches or seizures. He sought to suppress DNA samples obtained as a result of what he contended was an unlawfully prolonged detention. The superior court denied the motion.

"In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 505.)

On July 14, 2011, Hurtado asked Irvine Police Officer Jenny Lindsey to

10

stop defendant's pickup truck on a pretext and to surreptitiously obtain a sample of his DNA during the stop. Lindsey went on patrol that day with "a clean ticket book and a clean pen." That evening, she received word defendant's vehicle was on the move. When Lindsey saw defendant's pickup truck, it had already been stopped by Officer Wong for a tinted window violation. The stop and interaction between Lindsey and defendant was recorded.

At 7:23 p.m., Wong was behind defendant's pickup truck. Three seconds later, Wong activated his red light. Defendant stopped his pickup truck at the driveway entrance to his apartment complex. When stopped, he half blocked the underground parking driveway. Wong approached defendant's pickup truck and Lindsey subsequently arrived at the car stop at 7:26:41 p.m. Wong had obtained defendant's driver license and gave it to Lindsey when she arrived. Lindsey approached defendant, who was in his pickup truck, and told him he was stopped because of the tinted windows on the truck. She went back to her patrol car and wrote defendant a citation. She explained the citation to defendant and he signed it. After he signed the citation, Lindsey asked him for his thumbprint on the citation. The idea was to get defendant to lick his thumb before giving the thumbprint. That way his DNA could be obtained from the citation. Lindsey told defendant her ink pad was dry and asked him to lick his thumb prior to rolling it across the ink pad. That ploy did not work because defendant's hands were dirty from work, so he used bottled water to wet his thumb.

Ordinarily, a detention for tinted windows would end with the issuance of "a fix-it ticket." When the plan to obtain DNA from the thumbprint did not work, Lindsey *extended* the detention and told defendant to wait. She returned to the squad cars and cooked up an idea whereby Wong, a DUI (driving under the influence) enforcement officer, would attempt to get defendant to consent to a breath test with the PAS breathalyzer. Wong returned to defendant's pickup truck. He said he was a member of the DUI enforcement team and wanted to make sure defendant was "okay to drive." He

11

asked defendant to take a breath test. Defendant was already at the entry of his driveway and the officers observed absolutely no sign that he may be impaired. Having defendant take a breath test was "purely a ruse." After the citation process was completed and defendant waited for the breath test, he removed the tinting from his pickup's windows, with Lindsey's permission.

Defendant agreed to perform the test. Wong returned to his squad car and obtained a PAS device. He then had defendant get out of his pickup truck and provide two breath samples. The PAS device was taken to Lindsey's squad car and defendant was released. The only DNA evidence obtained that day was from the PAS test. Defendant had been detained for approximately 20 minutes. The detention ended at 7:47:43 p.m. Ordinarily, a stop based on window tint would take five to seven minutes.

Defendant contends his detention was unduly prolonged so the police could obtain a DNA sample and that once he signed the citation the police had no valid reason to detain him any longer. The Attorney General argues the detention was not prolonged, because the time it took to get defendant to agree to take a PAS test and to perform the test did not "measurably" extend defendant's detention, relying on the United States Supreme Court's decision in *Arizona v. Johnson* (2009) 555 U.S. 323, 333. The applicable test, however, is set forth in *Rodriguez v. United States* (2015) __ U.S. __ [135 S.Ct. 1609].

In *Rodriguez*, a K-9 officer stopped Rodriguez for driving on a highway shoulder in violation of Nebraska law. (*Rodriguez v. United States*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 1612].) The police officer issued Rodriguez a written warning and returned to Rodriguez and his passenger their identifications. (*Id.* at p. __ [135 S.Ct. at p. 1613].) Although the basis for detaining Rodriguez had terminated at that point, the officer asked Rodriguez for permission to walk his dog around Rodriguez's vehicle. Rodriguez denied permission, at which point the officer ordered Rodriguez to turn off the ignition, get out of the vehicle, and stand in front of the officer's patrol vehicle. (*Ibid.*)

12

Backup arrived about five or six minutes after Rodriguez had signed the citation. (*Ibid*.) Halfway through a second pass around the vehicle, the dog alerted to the presence of drugs. "[A] large bag of methamphetamine" was then found during a search of the vehicle. (*Ibid*.)

The Supreme Court analogized a car stop for a traffic violation to a "*Terry* stop."[3] (*Rodriguez v. United States*, *supra*, ___ U.S. at p. ___ [135 S.Ct. at p. 1614].) "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [citation], and to attend to related safety concerns, [citation]." (*Ibid*.) The court noted it had previously held in *Illinois v. Caballes* (2005) 543 U.S. 405, 407, "that a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket. [Citation.]" (*Rodriguez v. United States*, *supra*, ___ U.S. at p. ___ [135 S.Ct. at pp. 1614-1615].) The court held a police officer may conduct certain inquiries unrelated to a lawful traffic stop only so long as the inquiries do not prolong the traffic stop. (*Id*. at p. ___ [135 S.Ct. at p. 1615].) The court observed that unlike inquiries concerning review of the driver's license and a check for outstanding warrants, using a dog to sniff the vehicle was not aimed at the "mission" of issuing a citation, but rather was "aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.' [Citation.]" (*Ibid*.) Because the dog sniff took place after the "mission" of the stop—issuance of the citation—the court remanded the matter to the appellate court to determine "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation." (*Id*. at p. ___ [135 S.Ct. at pp. 1616-1617].) If such evidence did not exist, the prolonged detention was unlawful and the fruits of the dog sniff (methamphetamine) was unlawfully obtained in violation of the Fourth Amendment and must be suppressed.

---

[3] *Terry v. Ohio* (1968) 392 U.S. 1.

Here, as in *Rodriguez*, the police completed the "mission" underlying the stop of defendant's pickup truck when an officer issued defendant a fix-it citation for the tinted windows. Defendant should have been released once he signed the citation and put his thumbprint on it at the officer's direction. There has been no argument to the effect that the police had a justification to detain defendant any further. Instead, it is argued that once defendant agreed to take the breath test, what was inarguably a detention up to that point, became a consensual encounter. The argument is without merit.

The police are certainly free to approach an individual and speak with him or her without implicating the Fourth Amendment. This occurs during what is commonly referred to as a consensual encounter. Such encounters result in "no restraint of an individual's liberty whatsoever." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784, citing *Florida v. Royer* (1983) 460 U.S. 491.) Defendant was detained when he complied with Wong's demand (red light) to pull over. (*People v. Brown* (2015) 61 Cal.4th 968, 976-977.) Thereafter he was cited for having tinted windows, and before he was released by the police, Wong, a member of the DUI enforcement team, approached defendant and said he wanted to make sure defendant was safe to drive and that to do so, he wanted defendant to take a breath test. Defendant agreed to take the tests and was then directed to get out of his vehicle.

There is nothing in the facts presented below to turn the detention into a consensual encounter. If the Attorney General's argument were to be accepted, every driving under the influence detention would become a consensual encounter as soon as the suspect "voluntarily" performed the field sobriety tests or provided a breath sample at the officer's request. It is one thing for a police officer to approach a person on the street and ask if he or she minds answering some questions, and quite another for the police to use a show of authority, such as a red light, in order to get a suspect to submit to the police and pull over. An encounter is consensual if "a reasonable person would feel free to disregard the police and go about his or her business." (*In re Manuel G.* (1997) 16

14

Cal.4th 805, 821.) No reasonable person in defendant's position would have felt he was free to leave when confronted by a police officer who pulled him over and said he wants defendant to submit to a breath test because he does not know whether defendant can dive safely. The fact that the police had absolutely no reason to suspect defendant was impaired adds nothing to the consensual encounter versus detention analysis.

Defendant's detention was prolonged after the reason for the stop—the tinted window issue—had been resolved. The DNA obtained from the PAS device used to obtain defendant's breath samples was obtained in violation of defendant's Fourth Amendment rights (*Rodriguez v. United States*, *supra*, __ U.S. __ [135 S.Ct. 1609]) and should have been suppressed. That does not, however, resolve the matter.

At trial, the district attorney introduced evidence of the DNA sample obtained from the PAS device. The district attorney also introduced evidence of DNA obtained from a buccal swab taken on the day of defendant's subsequent arrest. The record does not indicate whether defendant was arrested and the buccal swab obtained that same day occurred because of the DNA obtained from the PAS device. There was other damning evidence tying defendant to the charges. For instance, defendant left his thumbprint on duct tape used to bind Karen. Determining that the latent print matched defendant's known print obtained from DMV records and/or the traffic stop (which is not alleged to have been obtained in violation of defendant's Fourth Amendment rights) would support arresting defendant for the crimes perpetrated on Karen. Indeed, a day *before* the crime lab notified the detective of the DNA results, a search warrant issued to search defendant's residence, pickup truck, and his workplace at Fletcher Jones.

Defendant contends the DNA sample obtained when he was arrested should be suppressed as the tainted fruit of his prolonged detention. (See *Wong Sun v. United States* (1963) 371 U.S. 471, 485 ["exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of" a Fourth Amendment violation].) The record does not support his contention. At the hearing on

15

defendant's motion to suppress evidence, he established his detention was unduly prolonged to obtain his DNA sample on the PAS device. There was, however, no evidence presented regarding any other evidence to be suppressed. Neither was there any evidence concerning defendant's arrest.

"Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is 'tainted' or is 'fruit' of a prior illegality is whether the challenged evidence was '"come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint."' [¶] It has been well established for more than 60 years that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint'. . . . It is not to be excluded, for example, if police had an 'independent source' for discovery of the evidence." (*Segura v. United States* (1984) 468 U.S. 796, 804-805.) There was *no* evidence connecting defendant's arrest and the taking of the buccal swab with the unlawful extension of defendant's detention to obtain his DNA sample by using a ruse to get him to blow into a PAS device despite a complete lack of evidence indicating defendant was impaired at the time.

"'As for secondary evidence, the defendant bears the burden of making a prima facie case that such evidence was "tainted" by—i.e., causally linked to—the primary illegality.' [Citation.] To do this, the defendant 'must show more than that the challenged evidence "would not have come to light *but for* the illegal actions of the police"; rather, [the defendant] must establish that it "'has been come at by *exploitation* of that illegality . . . .'"' [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 760, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) The burden then shifts to the prosecution to prove the secondary evidence is not tainted by the prior illegality. (*Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1138 [defendant

16

bears the initial burden to demonstrate the secondary evidence is tainted, "after which the government 'has the ultimate burden of persuasion to show its evidence is untainted'"].) As defendant never introduced prima facie evidence of a taint, the prosecution was not required to prove the lack of taint.

Admission of evidence obtained in violation of the Fourth Amendment requires reversal of the conviction unless the prosecution can demonstrate the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) The prosecutor introduced evidence of the DNA sample obtained from PAS device in violation of defendant's Fourth Amendment rights. Additionally, however, there was also evidence that a buccal swab was obtained from defendant at the time of his arrest, and that DNA profile matched the DNA profile obtained from the PAS device. This raises the question of whether defendant was prejudiced by the introduction of the DNA profile obtained from the PAS device. If the profile obtained from the PAS device was the same as the profile obtained from the defendant's buccal swab and that profile was the same as the profile obtained from the swab from Karen's breast where her assailant licked, and the swab from Danielle's back where her assailant ejaculated are the same— and they all were—evidence of the profile obtained from the PAS device was mere surplusage and its admission was harmless. Evidence of defendant's DNA sample from the PAS device added nothing to the weight of evidence against defendant.

In conclusion, we find the DNA sample obtained on July 14, 2011, as a result of defendant's unlawfully prolonged detention was seized in violation of defendant's Fourth Amendment rights. Defendant did not introduce evidence that the DNA obtained from a buccal swab taken when he was arrested was tainted by his earlier unlawfully prolonged detention when the first DNA sample was taken. The failure to suppress the evidence of the DNA obtained from PAS device was harmless because the prosecution also introduced evidence of defendant's DNA sample obtained as a result of his arrest days later. That DNA profile was the same as the one obtained during the

17

unlawful detention and the same as the DNA profile obtained from swabs taken from each of the victims, and defendant's thumbprint was found on duct tape he used when he tied and bound Karen.

### III

### DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.

18