Filed 10/4/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL DAVID FORNEY,<br><br>    Defendant and Appellant. | A144450<br><br>(Sonoma County<br>Super. Ct. No. SCR656511) |

I.
INTRODUCTION

Defendant Michael Forney appeals from a judgment entered pursuant to a no contest plea to unlawful oral copulation (Pen. Code, § 288a, subd. (b)(2))[1] and unlawful sexual intercourse (§ 261.5, subd. (d)). In accordance with the terms of a negotiated disposition, the trial court suspended imposition of sentence and placed defendant on three years formal probation. Defendant challenges three conditions of his probation: (1) that he waive his Fifth Amendment right against self-incrimination and submit to polygraph examinations as part of a sex offender management program; (2) that he not contact any minor without prior approval of his probation officer; and (3) that he not reside near or be any place where minors congregate.

The validity of the sex offender management program Fifth Amendment waiver and polygraph requirement—a probation condition statutorily required under section 1203.067, subdivision (b)(3)—is currently on review by our Supreme Court. (*People v. Rebulloza*, review granted June 10, 2015, S225503; *People v. Klatt*, review granted

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

July 16, 2014, S218755; *People v. Friday*, review granted July 16, 2014, S218288; *People v. Garcia*, review granted July 16, 2014, S218197.)

Binding United States Supreme Court precedent holds that a probationer cannot be compelled to relinquish his Fifth Amendment right against self-incrimination, and in our view, this authority also makes clear the choice between agreeing to the mandatory Fifth Amendment waiver as a condition of probation or facing immediate incarceration is an impermissibly coercive one. (*Minnesota v. Murphy* (1984) 465 U.S. 420, 435-437 & fn. 7 (*Murphy*); see also *McKune v. Lile* (2002) 536 U.S. 24, 35 (*McKune*) [holding consequences of prison inmate's refusal to waive Fifth Amendment and participate in sexual abuse treatment program did not rise to impermissible "compulsion" to incriminate himself; however, if consequences did "combine to create a compulsion that encumber[ed] the constitutional right," the state could not "continue the program in its present form"].) We therefore order the Fifth Amendment waiver stricken from the first of the challenged probation conditions. However, under this same high court authority, as well as California precedent, the polygraph requirement, shorn of the compelled Fifth Amendment waiver, is valid.

As for the no contact with minors, residency, and location probation conditions, the Attorney General largely agrees they should be modified. We also agree and order appropriate modifications of these conditions.

II.
DISCUSSION[2]

*The Fifth Amendment Waiver and Polygraph Testing Requirement*

1.     The Fifth Amendment Waiver Is Unconstitutionally Coercive

As required by section 1203.067, subdivision (b)(3), defendant was ordered, as a condition of probation, to "[w]aive[] . . . any privilege against self-incrimination and participate in polygraph examinations, which shall be part of the sex offender

---

[2] Given the issues on appeal, we need not separately set forth either the facts of the crimes to which defendant pleaded no contest or the procedural background of the case.

2

management program." He contends this condition violates his Fifth Amendment right against self-incrimination and is overbroad in any event. In our view, the United States Supreme Court's decisions in *Murphy*, *supra*, 465 U.S. 420 and *McKune*, *supra*, 536 U.S. 24 are controlling on the Fifth Amendment issue and compel the conclusion that the statutorily required waiver cannot stand.

In *Murphy*, the defendant was subject to a probation condition that he participate in a sex offender treatment program, report to his probation officer as directed, and be truthful with the probation officer " 'in all matters.' " (*Murphy*, *supra*, 465 U.S. at p. 422.) In his treatment program, the defendant admitted a prior rape and murder. (*Id.* at p. 423.) These admissions were communicated to his probation officer, who then asked defendant to meet with her; she told him she intended to convey any incriminating information he provided to the police. (*Id.* at p. 424.) The defendant admitted the crimes to the probation officer, which resulted in the filing of new criminal charges. In the new case, he sought to suppress the admissions. (*Id.* at pp. 424-425.)

The specific issue before the Supreme Court was whether the defendant's failure to actually invoke his Fifth Amendment privilege against self-incrimination could be excused on the ground that his admissions to the probation officer had been "compelled." (*Murphy*, *supra*, 465 U.S. at p. 434.) Generally, the Fifth Amendment is not "self-executing" and must be invoked in order to obtain its protection. (*Id.* at p. 431.) There are, however, several exceptions, one of which is when the consequences of invoking the right are so severe the individual is effectively compelled to incriminate himself. (*Id.* at pp. 434-435.) This exception, developed in a line of cases referred to as the "penalty cases," applies where "the State not only [has] compelled an individual to appear and testify, but also [has] sought to induce him to forego the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' [Citation.]" (*Id.* at p. 434.)

The high court explained "[t]he threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and

3

discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." (*Murphy*, *supra*, 465 U.S. at p. 435.)

"The situation would be different," observed the court, "if the questions put to a probationer were relevant to his probationary status and posed no realistic threat of incrimination in a separate criminal proceeding. If, for example, a residential restriction were imposed as a condition of probation, it would appear unlikely that a violation of that condition would be a criminal act. Hence, a claim of the Fifth Amendment privilege in response to questions relating to a residential condition could not validly rest on the ground that the answer might be used to incriminate if the probationer was tried for another crime. Neither, in our view, would the privilege be available on the ground that answering such questions might reveal a violation of the residential requirement and result in the termination of probation. Although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding. [Citations.] Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer. It follows that whether or not the answer to a question about a residential requirement is compelled by the threat of revocation, there can be no valid claim of the privilege on the ground that the information sought can be used in revocation proceedings." (*Murphy*, *supra*, 465 U.S. at p. 435, fn. 7.)

And, added the high court, "[o]ur cases indicate . . . that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, *as long as it recognizes that the required answers may not be used in a criminal*

*proceeding and thus eliminates the threat of incrimination. Under such circumstances*, a probationer's 'right to immunity as a result of his compelled testimony would not be at stake' [citations], and nothing in the Federal Constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as 'one of a number of factors to be considered by a finder of fact' in deciding whether other conditions of probation have been violated. [Citations.]" (*Murphy*, *supra*, 465 U.S. at pp. 435-436, fn. 7, italics added.)

The court then turned to the question of "whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." (*Murphy*, *supra*, 465 U.S. at p. 436.) The court concluded that the state had not taken that "extra, impermissible step." (*Ibid.*)

The court explained, "[t]he state court did not attempt to define the precise contours of Murphy's obligation to respond to questions. On its face, Murphy's probation condition proscribed only false statements; *it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution. . . .* Without the benefit of an authoritative state-court construction of the condition, we are hesitant to read into the truthfulness requirement an additional obligation that Murphy refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime." (*Murphy*, *supra*, 465 U.S. at p. 437, italics added.) "Whether we employ a subjective or an objective test, there is no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination. There is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." (*Ibid.*)

Further, said the court, even "[i]f Murphy did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not

5

have been reasonable.  Our decisions have made clear that *the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege.*  It is not surprising, then, that neither the State court nor any State officer has suggested otherwise.  Indeed, in its brief in this Court, the State submits that it would not, and legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings."  (*Murphy*, *supra*, 465 U.S. at p. 438, italics added.)

The high court further explained probation revocation under Minnesota law is not "automatic."  (*Murphy*, *supra*, 465 U.S. at p. 438.)  There must be a hearing, and a court must find that the alleged violation was intentional or inexcusable, and that the need for confinement outweighs the policies favoring probation.  (*Ibid.*)  In short, the court had "not been advised of any case in which Minnesota ha[d] attempted to revoke probation *merely* because a probationer refused to make *nonimmunized* disclosures concerning his own criminal conduct."  (*Id.* at p. 439, italics added.)  And given the court's cases, "Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation."  (*Ibid*.)

The Supreme Court accordingly concluded Murphy's Fifth Amendment right was not self-executing, and he therefore had to actually invoke the privilege in order to claim its protection in the new criminal case.  (*Murphy*, *supra*, 465 U.S. at pp. 439-440.)

*Murphy* thus makes clear:  (a) probationers retain their Fifth Amendment privilege against self-incrimination, which embraces the right to remain silent and not answer questions that would elicit incriminating information; (b) a state may compel a probationer to answer potentially incriminating questions, but only if he is assured incriminating answers will not be used in a pending or new criminal proceeding (i.e., only if the state guarantees the *preservation* of his Fifth Amendment right not to be called as a witness against himself); and (c) probation cannot be revoked solely because a probationer exercises his Fifth Amendment right to remain silent.  (*Murphy*, *supra*, 465 U.S. at pp. 439-440.)

6

In *McKune*, the high court addressed the constitutionality of a prison sexual abuse treatment program which was mandatory for inmates convicted of sex crimes. The program required inmates to, among other things, accept responsibility for the crime for which they had been sentenced, provide a complete sexual history regardless of whether it included uncharged crimes, and take a polygraph to confirm the accuracy and completeness of the history. It also required prison authorities to report uncharged sexual offenses involving minors, and the state reserved the right to initiate criminal proceedings. (*McKune*, *supra*, 536 U.S. at p. 30.) The consequences of refusing to participate in the program included reduction of visiting rights, earnings, work opportunities, canteen expenditures, and access to television, as well as transfer to a maximum-security unit. (*Id.* at p. 31.) McKune refused to participate on Fifth Amendment grounds and brought a civil rights action under title 42 United States Code section 1983 (hereafter section 1983) for injunctive relief. (*Ibid.*) The court produced a fractured opinion.

Given that the state reserved the right to use information disclosed during the program as the basis for new criminal charges, the plurality stated the issue was "whether the State's program, and the consequences for nonparticipation in it, combine to create a compulsion that encumbers the constitutional right. If there is compulsion, the State cannot continue the program in its present form . . . ." (*McKune*, *supra*, 536 U.S. at p. 35.) The court then undertook a lengthy defense of the merits of the program, stating "[t]herapists and correctional officers widely agree that clinical rehabilitation programs can enable sex offenders to manage their impulses and in this way reduce recidivism" and deeming the elements of the challenged program (that it was mandatory, required acceptance of responsibility for the crime of conviction, required a complete sexual history, required truthfulness, and allowed for prosecution of other sex crimes) as essential to its efficacy. (*Id.* at pp. 32-34, 47-48.)

The plurality next examined the consequences of McKune's refusal to participate in the program and concluded they did not rise to the level of "compulsion" necessary to implicate the Fifth Amendment. (*McKune*, *supra*, 536 U.S. at pp. 35-47.) The plurality

7

commenced its discussion by stating that while an inmate retains his Fifth Amendment privilege, the "compulsion" inquiry must take into account the fact of confinement and that rehabilitation "is a legitimate penological interest that must be weighed against the inmate's liberty." (*Id.* at p. 36.) Notably, the plurality observed McKune's refusal to participate did "not extend his term of incarceration," nor did it adversely "affect his eligibility for good-time credits or parole." (*Id.* at p. 38.) His transfer to the maximum security unit was also not "intended to punish" him for exercising his Fifth Amendment right, said the plurality, but was due to the practical necessity of removing him from the housing unit dedicated to the rehabilitation program. (*Id.* at pp. 38-39.) As for the other consequences, McKune could not "cite a single case from this Court holding that the denial of discrete privileges for refusal to participate in a rehabilitation program amounts to unconstitutional compulsion." (*Id.* at p. 40.)

In the plurality's view, "what constitutes unconstitutional compulsion involves a question of judgment: Courts must decide whether the consequences of an inmate's choice to remain silent are closer to the physical torture against which the Constitution clearly protects or the *de minimis* harms against which it does not." (*McKune*, *supra*, 536 U.S. at p. 41.) The plurality concluded the consequences McKune faced—"denial of certain perquisites that make his life in prison more tolerable"—did not add up to compulsion to waive his Fifth Amendment right. (*Id.* at pp. 42-45.)

Justice O'Conner, while not entirely agreeing with the plurality's articulation of the "compulsion" standard, agreed the alterations in McKune's prison conditions "were [not] so great as to constitute compulsion for the purposes of the Fifth Amendment." She thus concurred in the judgment rejecting McKune's constitutional challenge to the program. (*McKune*, *supra*, 536 U.S. at pp. 48-49 (conc. opn. of O'Connor, J..) She observed "[t]he Court today is divided on the question of what standard to apply when evaluating compulsion for the purposes of the Fifth Amendment privilege against self-incrimination in a prison setting." (*Id.* at p. 48.) She posited, however, similar to the plurality, that Fifth Amendment analysis in the criminal setting should be different from that in other contexts. "Forcing defendants to accept such consequences seems to me

8

very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony." (*Id.* at p. 53.) In any case, in her view, none of the privileges McKune stood to lose was "compulsive on any reasonable test." (*Id.* at p. 54.)

In the dissent's view, putting McKune to the choice of exercising his Fifth Amendment rights or being transferred to maximum security amounted to unconstitutional compulsion—no matter how laudable the goals of the state's sex abuse treatment program. (*McKune*, *supra*, 536 U.S. at pp. 55, 71 (dis. opn of Stevens, J.).)

In light of *Murphy* and *McKune*, we do not see how the Fifth Amendment waiver required by section 1203.067, subdivision (b)(3) can survive. Both cases make clear a convicted sex offender retains his Fifth Amendment privilege not to provide incriminating answers that could be used in a pending or subsequent criminal proceeding, and the pivotal question is whether the consequences of a defendant's refusal to waive his Fifth Amendment right rise to the level of unconstitutional compulsion to waive it. Here, the consequences of a defendant's refusal to waive the Fifth Amendment is denial of probation and immediate incarceration. While neither *Murphy* nor *McKune* addressed this precise question, commentary in both cases inevitably leads, we think, to the conclusion this amounts to unconstitutional compulsion to forego the Fifth Amendment.

In *Murphy*, for example, the Supreme Court specifically pointed out the state's sex offender program did not require the probationer to waive his Fifth Amendment privilege and had it done so, on pain of revocation, the state would have attached "an impermissible penalty to the exercise of the privilege." (*Murphy*, *supra*, 465 U.S. at p. 437; see also *id.* at p. 435 [there is "a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation"]; *id.* at p. 437 ["Murphy's probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular question and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution"]; *id.* at p. 438

9

[revocation of probation was not "automatic" on a probationer's invocation of his Fifth Amendment rights].)  In *McKune*, the plurality specifically pointed out an inmate's refusal to participate in the sex abuse treatment program did not extend his term of incarceration or affect his eligibility for good-time credits or parole.  (*McKune*, *supra*, 536 U.S. at p. 38.)

If, as the high court posited in *Murphy*, a defendant cannot constitutionally be forced to choose between waiving his Fifth Amendment privilege and suffering revocation of his probation, we do not see how a defendant can constitutionally be forced to choose between waiving his privilege and suffering outright denial of probation and immediate incarceration.  We think the same follows from the plurality's suggestion in *McKune* that an inmate cannot be forced constitutionally to choose between waiving his Fifth Amendment privilege and suffering extended incarceration or loss of parole.

The Attorney General puts great stock in the United States Supreme Court's decision in *Chavez v. Martinez* (2003) 538 U.S. 760, 769-770 (*Chavez*), decided one year after *McKune*, *supra*, 536 U.S. 24, and the California Supreme Court's decision in *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, relying on *Chavez* to allow prosecution access to compelled mental examinations.  Both cases are readily distinguishable, and neither so much as suggests that the United States Supreme Court has retreated from its "penalty cases," and specifically from *Murphy* and *McKune*.

The issue in *Chavez*, *supra*, 538 U.S. 760 was whether an interrogating officer could claim qualified immunity in a civil rights case brought by one Oliverio Martinez, who had been questioned without *Miranda*[3] warnings while being treated in an emergency room.  In an even more fractured opinion than *McKune*, the high court reversed the Ninth Circuit Court of Appeals' opinion denying qualified immunity and remanded for consideration of whether Martinez could base his section 1983 claim on

---

[3] *Miranda v. Arizona* 384 U.S. 436.

substantive due process grounds.[4]  A majority of the justices agreed Martinez could not base his section 1983 claim on the Fifth Amendment, but offered varying reasons.

Justice Thomas, joined by the Chief Justice and Justices O'Conner and Scalia, expressed the view that Martinez could not anchor his section 1983 claim on the Fifth Amendment because his incriminating statements were never used against him in a criminal prosecution.  The Fifth Amendment on its face, stated Justice Thomas, provides only that a person cannot " 'be compelled in any criminal case to be a witness against himself.' " (*Chavez*, *supra*, 538 U.S. at p. 766, italics omitted.)  Thus, while officials may "impair" the Fifth Amendment right against self-incrimination prior to trial, " 'a constitutional violation occurs only at trial.' " (*Id.* at p. 767, italics omitted, quoting *United States v. Verdugo-Urquidez* (1990) 494 U.S. 259, 264.)  Therefore, "mere use of compulsive questioning, without more," could not support Martinez's action for damages.  (*Id.* at p. 767.)  Justice Thomas explained this result was fully consistent with the court's case law, including *Murphy*, in which the court made clear individuals *can* be compelled to reveal incriminating information, including on pain of contempt, "so long as those statements (or evidence derived from those statements) cannot be used against the speaker in any criminal case."  (*Id.* at pp. 767-768.)  Martinez's situation was not materially different, since his compelled statements were never used against him.  (*Id.* at p. 769.)  That Martinez could not point to any completed constitutional tort was also not at odds with the court's creation of "prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause," specifically referencing

---

**4**  Justice Souter authored the "opinion" of the court, joined by Justices Breyer, Stevens, Kennedy, and Ginsburg, which consisted of a single sentence remanding the case for consideration of whether Martinez could pursue a substantive due process claim (not a Fifth Amendment claim).  (*Chavez*, *supra*, 538 U.S. at p. 777.)  Justice Thomas announced the "judgment" of the court, joined by the Chief Justice and Justices O'Connor and Scalia (*id.* at p. 763), and concurred in by Justice Souter (*id.* at p. 777).  Justice Scalia concurred "in part" with the judgment.  (*Id.* at p. 780.)  While Justice Ginsburg stated "[t]o assure a controlling judgment" she was joining "Part II" of Justice Souter's opinion, part II is actually designated the "opinion" of the court.  (*Id.* at pp. 777, 802 (conc. & dis. opn. of Ginsburg, J.).)

11

the court's "penalty cases jurisprudence." (*Id.* at pp. 770, 772, fn. 3 ["That the privilege is a prophylactic one does not alter our penalty cases jurisprudence, which allows such privilege to be asserted prior to, and outside of, criminal proceedings"].) In his separate concurring opinion, Justice Scalia emphasized "[s]ection 1983 does not provide remedies for violations of judicially created prophylactic rules." (*Chavez*, *supra*, 538 U.S. at p. 780 (conc. opn. of Scalia, J.).)

Justices Souter and Breyer also agreed Martinez could not ground his section 1983 claim on the Fifth Amendment. "Martinez claims more than evidentiary protection in asking this Court to hold the questioning alone was a completed violation of the Fifth and Fourteenth Amendments subject to redress by an action for damages under [section] 1983. [¶] To recognize such a constitutional cause of action for compensation would, of course, be well outside the core of Fifth Amendment protection . . . ." (*Chavez*, *supra*, 538 U.S. at p. 777 (conc. opn. of Souter, J., Breyer, J. joining).) Indeed, if the court did recognize such a damages claim it "would revolutionize Fifth and Fourteenth Amendment law," a result Justices Souter and Breyer believed was unsupported and unwarranted. (*Id.* at p. 779.) They also observed that refusing to embrace such an "extension" of the Fifth Amendment was not incompatible with other Fifth Amendment holdings, including the "penalty cases" such as *McKune*.[5] (*Chavez*, at pp. 777-778.)

*Chavez* thus confronted the high court with a civil rights claim for damages based on coercive questioning, alone, and a majority of the court could not countenance this kind of extension of Fifth Amendment law. However, what is significant for our purposes is that regardless of the multiplicity of reasoning in *Chavez*, there is no mistaking that the court preserved its "penalty case" jurisprudence, including *Murphy* and *McKune*.

---

[5] Justices Kennedy, Stevens, and Ginsburg were of the view an actionable Fifth Amendment violation can occur immediately upon coercive extraction of incriminating statements. (*Chavez*, *supra*, 538 U.S. at pp. 790-795 (conc. & dis. opn. of Kennedy, J., joined by Stevens, J. and, in part, by Ginsberg, J.); *id.* at p. 799 (conc. & dis. opn. of Ginsberg, J.).)

In *Maldonado*, after defendant's notification that he intended to present mental-state evidence, the prosecution sought and the trial court ordered compelled mental examinations by three court-appointed experts. (*Maldonado*, *supra*, 53 Cal.4th at p. 1119.) The defendant then sought and was granted a protective order barring the prosecution from attending the examinations, barring access to reports, notes and recordings of the examinations, and barring contact with the experts until the close of the defendant's case and until the trial court had reviewed the material and resolved admissibility issues. (*Id.* at p. 1120.) He claimed that unless he actually presented a mental-state defense at trial, his Fifth Amendment privilege applied to anything he told the examiners. (*Id.* at pp. 1120-1121.)

Citing extensively to *Chavez*, *supra*, 538 U.S. 760, our Supreme Court explained the Fifth Amendment is not "a guarantee against officially compelled *disclosure*," but rather is protection against being compelled to testify against oneself in a criminal proceeding. (*Maldonado*, *supra*, 53 Cal.4th at pp. 1127-1128.) Accordingly, the Fifth Amendment cannot be invoked to bar the prosecution from access to the compelled mental-state examination materials. However, continued the court, the state can compel incriminating statements only so long as it recognizes such statements *cannot be used* against the individual in a criminal proceeding, absent his or her waiver of the Fifth Amendment. (*Id.* at pp. 1129-1130.) In other words, the state may compel incriminating statements if it preserves the individual's core Fifth Amendment right not to testify against oneself in a criminal case. The court went on to insure this protection for defendants subject to compelled mental examinations by judicially immunizing from use at trial, as "prophylactic protection of their Fifth Amendment privilege," any incriminating statements made during the course of such examinations, unless and until the defendant waives the privilege by presenting mental-state evidence. (*Id.* at p. 1129, fn. 10.) Thus, while the prosecution can have pretrial access to compelled mental examination materials, it cannot use incriminating information in those materials until the defendant actually waives his Fifth Amendment privilege by presenting mental-state evidence at trial. (*Id.* at p. 1132 [defendant "retains the 'unfettered choice' whether to

13

actually present such a defense at trial"; if he decides to forego such defense, "any self-incriminating results of the examinations cannot be introduced or otherwise used against him"].)

Thus, contrary to what the Attorney General suggests, *Maldonado* in no way departs from what we view as the controlling United States Supreme Court cases, *Murphy* and *McKune*. On the contrary, *Maldonado* recognizes that state-compelled disclosure of incriminating information is permissible only if the state *preserves* the individual's right to invoke the Fifth Amendment's core protection against testifying against oneself in a criminal proceeding. And that is the essential problem with the statutorily mandated probation condition—it does not preserve the probationer's Fifth Amendment privilege. Rather, it not only compels the probationer to answer any and all questions, regardless of whether the answers are incriminating, it *also* compels him to waive his Fifth Amendment right. While binding United States Supreme Court and California Supreme Court precedent permits the state's first act of compulsion, it precludes the state from also demanding the second. We therefore order the Fifth Amendment waiver stricken from defendant's probation condition.

2.      The Polygraph Requirement, Absent the Compelled Fifth
         Amendment Waiver, Is Valid

Having held that the compelled Fifth Amendment waiver is invalid, we now consider whether requiring defendant to submit to polygraph examinations, without the compelled waiver, impermissibly infringes upon his Fifth Amendment privilege against self-incrimination.

On this issue we agree with the Attorney General that *Chavez* and *Maldonado* clearly permit compelled answers, so long as the probationer *retains* his core Fifth Amendment right not to have any incriminating answers used against him in a pending or future criminal proceeding. That is also the import of *Murphy* and *McKune*. As we have discussed, in both cases, a majority of the court recognized that if the defendant's statements were "immunized"—i.e., could not be used against him in a pending or subsequent criminal proceeding—then compelled truthfulness would not implicate the

14

Fifth Amendment. (*McKune*, *supra*, 536 U.S. at p. 35 [if state "offered immunity, the self-incrimination privilege would not be implicated"]; *Murphy*, *supra*, 465 U.S. at pp. 426 [witness may refuse to answer " 'unless and until he is protected at least against use of his compelled answers and any evidence derived therefrom in any subsequent criminal case in which he is a defendant' "]; p. 437 [probation condition only required truthfulness, it "said nothing about his freedom to decline to answer particular questions"].)

Indeed, it has long been settled law in our state that requiring a polygraph examination does not violate an individual's Fifth Amendment right. (E.g., *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 320 ["The fact that [the defendant] has a duty to answer the polygraph examiner's question truthfully does not mean his answers are compelled within the meaning of the Fifth Amendment."]; *People v. Miller* (1989) 208 Cal.App.3d 1311, 1315 ["[a]lthough defendant [a probationer convicted of a sex offense] has a duty to answer the polygraph examiner's questions truthfully, unless he invokes the privilege, [or] shows a realistic threat of self-incrimination but nevertheless is required to answer, no violation of his right against self-incrimination is suffered."].)

Apart from his Fifth Amendment challenge, defendant maintains the polygraph requirement is impermissibly overbroad, asserting "[i]t contains no limitation whatever on the types of questions that can be asked." Defendant contends that to pass muster under *People v. Lent* (1975) 15 Cal.3d 481, questions must be limited to those "reasonably related to his successful completion of the sex offender management program, the crime of which he was convicted, or related criminal behavior, whether past or future."

Pursuant to section 9003, subdivisions (a), (b), and (d), the California Sex Offender Management Board (CASOMB) is required to publish on its website certification standards for sex offender management programs and professionals.[6] All

_____

[6] <http:// www.casomb.org/docs/Polygraph_Standards_FINAL.PDF> [as of October 4, 2016].

15

polygraph examiners working with a certified sex offender management program must meet these standards. (CASOMB, Post-Conviction Sex Offender Polygraph Standards, Introduction.) The standards set forth a model policy, program goals, the various types of examinations to be administered, and the types of questions that examinations should include, among other criteria. These examinations may be used "to test the limits of an examinee's admitted behavior and to search for other behaviors or offenses not included in the allegations made by the victim of the instant offense." (*Id.*, at § 8.8.1.2.)

"Examiners, along with the other members of the community supervision team, should select relevant targets from their concerns regarding additional or unreported offense behaviors in the context of the instant offense." (CASOMB, Post-Conviction Sex Offender Polygraph Standards, at § 8.1.2.1.) "Examiners should use the Prior Allegation Exam (PAE) to investigate and resolve all prior alleged sex offenses (i.e., allegations made prior to the current conviction) before attempting to investigate and resolve an examinee's history of unknown sexual offenses." (*Id.*, at § 8.8.2.) To discover "unreported victims," examiners should "thoroughly investigate the examinee's lifetime history of sexually victimizing others, including behaviors related to victim selection, victim access, victim impact, and sexual offenses against unreported persons." (*Id.*, at § 13.) The sex offense monitoring examination may be used at the request of other team members "to explore the possibility the examinee may have been involved in unlawful sexual behaviors including a sexual re-offense" during the period of supervision. (*Id.*, at § 22.) Questions about illegal conduct are not limited to sex offenses; they may include, but are not limited to, questions about the use or distribution of illegal drugs or controlled substances. (*Id.*, at § 4.2.3.) Polygraph examiners should disseminate a written report regarding all pertinent information, test questions and answers, and results to members of the community supervision team and "to the court, parole board or other releasing agency." (*Id.*, at § 1.1.)

The Attorney General does not disagree with defendant's view that the scope of the required polygraph examinations is properly defined by the purposes of the sex offender management program mandated by section 1203.067, subdivision (b)(2). She

16

argues this is self-evident from the statutory language and context, and therefore there is no need to judicially add limiting language, particularly in light of the CASOMB standards developed to implement the program..

We agree with the Attorney General that the structure and language of the statute make it clear the required polygraph examinations are a tool to implement the sex offender management program and are to be administered in accordance with the CASOMB standards. Subdivision (b)(3) specifically states the polygraph examinations are "part of the sex offender management program." (§ 1203.067, subd. (b)(3).) Subdivision (b)(2), in turn, provides that the probationer shall successfully complete the program, "following the standards developed pursuant to Section 9003." (*Id.*, subd. (b)(2).) And it is pursuant to section 9003 that CASOMB promulgated the standards for administering the polygraph examinations that are part of the program. (§ 9003.)

It therefore seems apparent to us that the required polygraph examinations are not unfettered and cannot probe any area of inquiry with impunity, whether or not questions are related to the sex offender management program. Rather, it is inherent in the structure and language of the statute that polygraph examinations be used only in furtherance of the probationer's treatment. (See *Brown v. Superior Court*, *supra*, 101 Cal.App.4th at p. 321 [modifying undefined polygraph condition imposed after defendant failed to cooperate in stalking therapy program to limit questions "to those relating to the successful completion of" the program and the crime of which defendant was convicted].) Given this construction of the statute, there is no need to include any limiting language in the probation condition itself.

*The No-Contact-With-Minors Condition*

Defendant contends the probation condition ordering him not to "initiate, establish, or maintain contact with any minor, male or female, under the age of 18 years unless in the presence of a responsible adult and with prior approval of the Probation Officer" is constitutionally infirm because it lacks a scienter, or knowledge, requirement. He urges that the condition be modified to state he shall not "initiate, establish, or maintain contact with any minor, male or female, *that he knows is* under the age of 18

17

years . . . ." The Attorney General agrees the condition should be so modified, citing *People v. Turner* (2007) 155 Cal.App.4th 1432. In *Turner*, the appellate court ordered a very similar condition modified on the ground the defendant might not know an individual was under the age of 18. (*Id.* at pp. 1435-1436.)

We agree with the parties and order the probation condition modified accordingly.

*The Not-Near-Minors Condition*

Defendant similarly contends the probation condition ordering him not to "reside near, visit or be in or about parks, schools, day care centers, swimming pools, beaches, theaters, arcades or other places where children congregate without prior approval of your Probation Officer" is constitutionally deficient for lack of specificity as to what "near" means, lack of a knowledge requirement, and because it assertedly prohibits him from being in places essential to ordinary living, such as a grocery store. He suggests the specific residential distance set forth in section 3003.5 (2,000 feet) be used in place of "near" and a specific knowledge requirement be included. He urges the prohibition on visiting or being in or about "other places" where children congregate be stricken in its entirety.

The Attorney General agrees the term "near" is vague and can be replaced with the 2,000 foot distance set forth in section 3003.5. She also agrees a knowledge requirement is appropriate. She does not agree, however, that the condition is otherwise constitutionally overbroad, citing *People v. Delvalle* (1994) 26 Cal.App.4th 869, 878.

In *Delvalle* the court upheld a probation order requiring the defendant to " 'stay away from any places where minor children congregate.' " (*People v. Delvalle*, *supra*, 26 Cal.App.4th at p. 878.) The trial court then explained, " '[t]he obvious places that come to mind are elementary schools, day care, parks. [¶] Stay away from places where young children are around.' " (*Ibid.*) The appellate court concluded the places the trial court specifically mentioned provided sufficient examples of the kinds of places the defendant was to avoid. (*Id.* at p. 897; see also *United States v. Bee* (9th Cir. 1998) 162 F.3d 1232, 1235 [upholding probation condition that defendant " 'not loiter within

100 feet of school yards, parks, playgrounds, arcades, or other places primarily used by children under the age of 18' "].)

While we agree replacing "near" with 2,000 feet and including a knowledge requirement are warranted, we conclude the probation condition otherwise passes muster. If defendant is concerned he is precluded from going to a locale necessary for everyday living, such as a grocery store, laundromat, or gasoline station (none of which reasonably qualifies as a place where children congregate), he simply needs to confirm with his probation officer that his presence is permissible.

### III.
#### DISPOSITION

We order stricken the probation condition that defendant, pursuant to section 1203.067, subdivision (b)(3), waive his Fifth Amendment privilege against incrimination. Shorn of that Fifth Amendment waiver requirement, we uphold the condition that defendant, pursuant to that statutory provision, submit to polygraph examinations. We order the no-contact-with-minors condition modified to read defendant is not to "initiate, establish, or maintain contact with any minor, male or female, that defendant knows is under the age of 18 years unless in the presence of a responsible adult and with prior approval of the Probation Officer." We order the not-near-minors condition modified to read defendant is not to "reside within 2,000 feet of, or visit or be in or about, parks, schools, day care centers, swimming pools, beaches, theaters, arcades, or other places where defendant knows children congregate without prior approval of defendant's Probation Officer."

19

 

_____

Banke, J.

We concur:

_____

Margulies, Acting P. J.

_____

Dondero, J.

A144450, *People v. Forney*

Trial Court:                    Sonoma County Superior Court

Trial Judge:                    Honorable Jamie E. Thistlethwaite

Counsel for Appellant:          Rex Williams, under appointment by the First District
                                Appellate Project

Counsel for Respondent:         Kamala D. Harris, Attorney General, Gerald A. Engler,
                                Chief Assistant Attorney General, Jeffrey M. Laurence,
                                Senior Assistant Attorney General, Catherine A. Rivlin,
                                Supervising Deputy Attorney General, Ann Wathen,
                                Deputy Attorney General

                                Michael David Forney, in pro per